# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00382-CV

**James Derwood Iliff, Appellant**

**v.**

**Jerilyn Trije Iliff, Appellee**

## FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
### NO. 06-1108, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant James Derwood Iliff ("James") seeks review of the trial court's judgment
entering a final decree of divorce from appellee Jerilyn Trije Iliff ("Jerilyn"). In three issues, James
contends that the trial court abused its discretion in entering the final divorce decree by ordering
child support payments in excess of the statutory guidelines, by ordering an unfair division of the
marital estate, and by failing to appoint James as joint managing conservator with standard periods
of unsupervised possession. Because we conclude there was no error in the trial court's judgment,
we affirm.

## BACKGROUND

James and Jerilyn were married on April 7, 1990. Three children were born of their
marriage: C.J., a son, on July 14, 1993, C.T., a daughter, on January 3, 1997, and C.M., a daughter,

on February 10, 2001. Jerilyn filed for divorce on June 28, 2006. After a trial to the bench, the trial court entered a final decree of divorce on May 5, 2008.

The district court heard evidence that throughout most of the marriage, James worked in the chemical industry and was the "primary bread winner" of the family, earning between $90,000 to $100,000 per year.[1] From the time they were married until 1998, Jerilyn worked at various rehabilitation centers in Dallas, Houston, and Austin. In 1998, Jerilyn quit her job as a supervisor at St. David's to stay home with the children. The following year, Jerilyn returned to work part-time at St. Stephen's Episcopal School where the children attended school. Although her salary was substantially less than James's, Jerilyn received a tuition subsidy to help defray the cost of the children's attendance at St. Stephen's.

In 2005, James's company, Ashland Chemicals, Inc., was sold to Air Products and Chemicals, Inc. Later that year, James began hearing voices and saying that "people were watching us, that people were intercepting faxes from our home." He began to be more verbally abusive to Jerilyn and the children. Without explanation, on January 1, 2006, James quit his job with Air Products.

When James quit his job, Jerilyn obtained additional work to help pay the family's expenses. Jerilyn testified that she began working "approximately 50 hours a week" at three more jobs. Jerilyn testified that she began working as a PRN Therapist for Deer Creek Nursing Center and Brown Carnie, and that she also worked for Wimberley Home Health Care and as the after-school

---

[1] James held a bachelor's degree and a masters degree of business administration, and he had worked for 20 years in the chemical industry as a technical specialist, a chemical specialist, and ultimately an account manager.

2

coordinator at St. Stephen's School, so that she could "get a break on those costs." The record reflects that from January 1, 2006, through September 2006, James made several withdrawals from his retirement accounts totaling $85,000 to help the family meet its expenses. The parties agree that part of this money was used to pay off the liens on Jerilyn's Ford Expedition and James's truck and the lien on a Kubota tractor; however, the record reflects that the total value of these notes was approximately $45,000 and the remaining $40,000 was unaccounted for by James.

Jerilyn testified that, after he quit his job, James's behavior became erratic and irrational. He began talking about people listening to his telephone conversations, intercepting his faxes, and spying on him through the skylights. Jerilyn testified that James bought a .357 Magnum pistol because he thought that people were spying on him. Jerilyn averred that James's drinking became excessive and that she found empty tequila bottles in the closet. Jerilyn testified that James bought another gun and was sleeping excessively, did not bathe or change his clothes regularly, and was not brushing his teeth or "doing general hygiene." Jerilyn testified that there were occasions when she left the children at home with James to go to home health care appointments for her job and that, when she returned home, she would find James asleep in a locked office downstairs.

Jerilyn also testified that, one day in May 2006, the family was attending one of her daughter's dance lessons and that she and James got into an argument about his treatment of their son. That evening James became very ill, as if he had a stomach virus, and he was sick all night. The next day, Jerilyn came home to find him hallucinating downstairs and saying that there was a man in a black hat. Jerilyn took him to the hospital, and he was admitted to the intensive care unit

3

where he stayed for five days. Jerilyn testified that the hospital had to restrain James because of his paranoid behavior and that they administered anti-psychotic medication to calm him down.

Jerilyn filed for divorce in June 2006. Although Jerilyn and the children left the family home briefly so that Jerilyn could spend time with her father, who was dying of prostate cancer, the parties worked out an agreement under which James left and Jerilyn and the children returned to the family home before school started in the fall of 2006. From the time he left in the fall of 2006 until the trial in the spring of 2008, the record reflects that James saw his children only four times. The parties dispute whether James made additional attempts to see his children, but they did reach an agreement that the children would call him once a week during the hours of 6:00 p.m. - 8:00 p.m. on Wednesdays. James testified that he was traveling and trying to start his business and, therefore, he was not able to see his children on a regular basis. But he also testified that he was in central Texas at his property in Wimberley approximately once a month.

The record reflects that James lived primarily with his mother in the Dallas area from the fall of 2006 until trial in 2008. The record also reflects that James was hospitalized three more times during that period of time, but that the doctors found nothing physically wrong with him other than severe dehydration.

In 2007, the parties reached a mediated settlement agreement on temporary orders that was later reduced to a signed court order requiring the parties to participate in an interview with Dr. Caryl Dalton, a psychologist in Austin, Texas. After that interview, the parties were also required to participate in any further evaluation or testing recommended by Dr. Dalton. As part of that court order, the parties were required to follow the recommendations of Dr. Dalton regarding

4

visitation between James and the children pending further court order. After conducting the interview, Dr. Dalton made no further recommendation for evaluation of Jerilyn, but she recommended that James undergo both a neuropsychological exam and a neurological evaluation.

Although James underwent the neurological evaluation, he never obtained a neuropsychological exam, despite two additional court orders that he do so. The neurological evaluation was conducted by Dr. Robert Izor and was admitted into evidence at trial. Dr. Izor's evaluation reflected a diagnosis of paranoia and psychogenic movement disorder and recommended treatment with an anti-depressant or anti-anxiety medication, which James refused.

Based on his erratic behavior and repeated failure to comply with court orders for a neuropsychological exam, as well as the recommendations of Dr. Dalton, the court found that the standard possession order as contemplated in the family code was not appropriate and was not in the best interest of the children. Accordingly, the court named Jerilyn as sole managing conservator with James as possessory conservator. But the court restricted James's access to the children until he completed the required neuropsychological exam.

With regard to child support, the trial court found that James was intentionally unemployed or underemployed as a result of his own choosing. Although there was testimony and evidence in the record from three doctors, including Dr. Dalton, Dr. Izor, and Dr. James Williams, who had evaluated or treated James between the time Jerilyn filed for divorce up until trial, none of these doctors testified that there was any reason that James could not obtain gainful employment. James's mother Cynthia Iliff testified that he could not stand for long periods of time because of a martial arts injury that he had suffered just prior to Jerilyn's filing for divorce and that this injury

5

affected his gait, but none of the witnesses at trial testified that this injury would prevent James from working.

James testified that he was not disabled and that he had tried to start his own tractor business. James testified that his doctors ran extensive tests on him and found nothing wrong with his heart and that he had never been told by a doctor that he suffers from a condition that prevents him from working. He testified that his income from his tractor business was $1,287 in 2006 and about $1,200 in 2007. James also testified that he made about $1,200 "in the past two years" doing business management consulting.

Although his income was minimal, the record reflects that James had been paying $251.33 in child support for six months prior to trial. James testified that he had contracted for a fence and horse corral totaling $6,480[2] to be built on the Wimberley property in violation of a court order. And he testified that he had been paying "[a] couple of hundred dollars a month" towards the note on the Wimberley property as well as the annual taxes of $1,200 to $1,500 per year. When asked where he obtained the money to pay for these expenses, James testified, "It's coming from my savings."

In addition to the $85,000 he withdrew from his retirement accounts in 2006, the record reflects that James withdrew an additional $20,000 in 2007 to pay his lawyers. The record also reflects that the total balance of James's retirement accounts was $202,079.77 as of June 20, 2006, and that this balance had been reduced to $98,869.80 as of February 5, 2008, and was

---

[2] James testified that the estimated cost for the fence was $4,600 and the estimated cost for the horse corral was $1,880. He also testified that he paid $2,300 down for the contractor to start the job.

further reduced to $92,760 at the time of trial. Although James testified that he was the only person with access to his retirement accounts, he provided no explanation for the approximately $100,000 decrease in his retirement account balance from June 2006 until trial in 2008 other than to say it was based on market fluctuations.[3]

Based on his proven income shortly before the divorce, the trial court determined that James's gross monthly earning potential was $5,000.00 and that his net available resources were $3,662.09 per month. Accordingly, the trial court awarded child support of $1,098.63, plus $196.56 health insurance reimbursement, per month for three children; $915.52 child support, plus $196.56 health insurance reimbursement, per month for two children; and $732.42 child support, plus $196.56 health insurance reimbursement, per month for one child.

As part of its final divorce decree, the trial court also divided the marital estate. The trial court awarded the following property to Jerilyn:

- $ 5,000: 2001 Ford Expedition
- $ 8,632: Jerilyn's 401(k) account
- $100,000: Net value of the residence located at 130 Elm Hollow, San Marcos, Texas
- $ 12,992: Net proceeds off the top of the sale of property located at 501 Winding Trail, Wimberley, Texas
- $ 65,404: 60% of the net proceeds of the sale of property located at 501 Winding Trail, Wimberley, Texas
- $ 11,400: Personal property and furniture

The final divorce decree also assigned the following debts to Jerilyn:

---

[3] This $100,000 decrease included the $10,000 withdrawal in September 2006 and the $20,000 withdrawal in 2007.

7

- $ 94,526: The balance due on the first mortgage for the property located at 130 Elm Hollow, San Marcos, Texas
- $ 51,629: The balance due on the second mortgage for the property located at 130 Elm Hollow, San Marcos, Texas
- $ 38,148: Attorney's Fees

The trial court awarded the following property to James:

- $ 98,896: James's 401(k) accounts
- $ 19,300: 2001 Dodge 2500 Duramax Diesel 4X4 Truck
- $ 14,000: 2003 HST Kubota Tractor
- $ 300: 2003 16′ flatbed trailer
- $ 43,603: 40% of the net proceeds of the sale of property located at 501 Winding Trail, Wimberley, Texas

The final divorce decree also assigned the following debts to James:

- $ 3,755: Balance owing on Visa account
- $ 4,070: Balance owing on fence and corral construction
- $ 17,000: Balance owing on medical bills

The trial court signed and entered the final divorce decree on May 5, 2008.[4] Pursuant to James's request, the trial court entered findings of fact and conclusions of law on June 3, 2008. This appeal followed.

---

[4] Also included in the record before us is the trial court's statement on child support guidelines, which was filed on April 25, 2008.

## DISCUSSION

In three issues on appeal, James complains that the trial court abused its discretion when it entered the final decree of divorce. First, James argues that the trial court abused its discretion by ordering him to pay child support to Jerilyn in excess of the statutory guidelines. Second, James argues that the trial court abused its discretion when it ordered an unfair division of the marital estate. Finally, James argues that the trial court abused its discretion by failing to appoint him as joint managing conservator with standard periods of unsupervised possession. Jerilyn counters that there was no abuse of discretion and urges this Court to affirm the trial court's final decree of divorce.

### *Standard of Review*

With regard to the issues of child support, division of the marital estate, and child custody, possession, and visitation raised by James on appeal, we review the trial court's decisions on such matters for abuse of discretion. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (child support); *Murff v. Murff*, 615 S.W.2d 696, 698-99 (Tex. 1991) (division of marital estate); *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (child custody, control, possession, and visitation). A trial court's order on child support will not be disturbed on appeal unless the complaining party demonstrates that the order constituted a clear abuse of the trial court's discretion. *Worford*, 801 S.W.2d at 109. Absent a clear abuse of discretion, an appellate court will not disturb a trial court's division of property. *Murff*, 615 S.W.2d at 698-99; *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974). And we give wide latitude to the trial court's determinations on custody, control, possession, and visitation. *Gillespie*, 644 S.W.2d at 451.

9

As a general rule, a trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to guiding rules and principles. *Worford*, 801 S.W.2d at 109; *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). The fact that a trial court may decide a matter within its discretionary authority differently than an appellate court in similar circumstances does not demonstrate an abuse of discretion. *Downer*, 701 S.W.2d at 242. When reviewing matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). There is no abuse of discretion if some probative and substantive evidence supports the trial court's order. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied); *McGuire v. McGuire*, 4 S.W.3d 382, 384 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

Under an abuse of discretion standard, legal and factual sufficiency challenges to the evidence are not independent grounds of error, but are relevant factors in assessing whether the trial court abused its discretion. *Zeifman*, 212 S.W.3d at 587; *In re D. M.*, 191 S.W.3d 381, 393 (Tex. App.—Austin 2006, pet. denied); *Dunn v. Dunn*, 177 S.W.3d 393, 396 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Because we apply an abuse-of-discretion standard to the issues raised by James on appeal, the traditional sufficiency standards of review overlap the abuse of discretion standard, and we employ a hybrid analysis. *See Zeifman*, 212 S.W.3d at 587-88; *see also Echols v. Olivarez*, 85 S.W.3d 475, 476-77 (Tex. App.—Austin 2002, no pet.); *In re D.S.*, 76 S.W.3d 512, 516 (Tex. App.—Houston [14th Dist.] 2002, no pet.). We engage in a two-pronged inquiry asking first, whether the trial court had sufficient information upon which to exercise its discretion, and second, whether the trial court erred in its application of discretion. *Zeifman*, 212 S.W.3d at 588.

10

A traditional sufficiency review comes into play with regard to the first question, and we must then determine whether, based on the evidence, the trial court's decision was reasonable. *Id.*

In an appeal after a bench trial in which the trial court entered findings of fact and conclusions of law, the trial court's findings have the same weight as a jury verdict. *In re K.R.P.*, 80 S.W.3d 669, 673 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). When challenged, we review the trial court's findings for legal and factual sufficiency. *Id.*

We will sustain a legal sufficiency challenge when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). In determining whether there is legally sufficient evidence to support the finding under review, we examine the record for evidence and inferences that support the challenged finding, considering evidence favorable to the finding if a reasonable factfinder could, and disregarding evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827-28 (Tex. 2005). We will not substitute our judgment for that of the factfinder if the evidence falls in the zone of reasonable disagreement. *Id.* at 822. If there is any evidence of probative force to support the finding—i.e., more than a scintilla—we will uphold the finding and overrule the legal sufficiency challenge. *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003) (per curiam).

11

In determining a question of factual sufficiency, we weigh and consider all of the evidence in the record. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We will sustain a factual sufficiency challenge and "set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See id.*

In a case tried to the bench, the trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any witness's testimony. *Id*. at 697.

### *Child Support*

In his first issue, James complains that the trial court abused its discretion by awarding child support in excess of the statutory guidelines. James complains that there is no evidence to support the trial court's findings that his net available monthly resources were $3,662.09 and that he was intentionally unemployed or underemployed.

The evidence at trial showed that James had a bachelor's degree and a master's degree in business administration, that he had worked for almost twenty years in the chemical industry, and that he quit his job that paid $102,000 a year at the end of January 2006. With regard to his ability to work, James testified that he was not disabled and that no doctor had told him that he could not work. He further testified that, after quitting his job, he tried to start his own tractor business and that he received about $1,287 in 2006 and about $1,200 in 2007. He also testified that he received about $1,200 "in the past two years" from business management consulting. Based on this evidence, the trial court entered the following findings of fact with regard to child support:

12

7. The Court has already entered a Statement on Child Support Guidelines signed and entered on April 25, 2008. A true and correct copy of which is attached hereto and incorporated herein.

8. The Court further finds:

1. [T]he amount of child support ordered by the court is in accordance with the percentage guidelines;

2. [T]he amount of net resources available to JAMES DERWOOD ILIFF per month is $3,662.09. This finding is based in part upon JAMES DERWOOD ILIFF's proven earnings shortly before the filing of the divorce, his educational background, his intentional unemployment or underemployment, JAMES DERWOOD ILIFF's earning potential, and the evidence presented at trial. JAMES DERWOOD ILIFF's own testimony at trial showed that he made in excess of $100,000 in earnings in 2005, the year immediately prior to the filing of divorce. JAMES DERWOOD ILIFF testified at trial that he had left his employment voluntarily in December of 2005. He further testified that he was not disabled or unable to work and plans to start his own business. JAMES DERWOOD ILIFF's monthly gross earning potential is found to be no less than $5,000 per month. . . .

The paramount principle guiding our review of the trial court's determination on child support is the best interest of the child. *See Rodriguez v. Rodriguez*, 860 S.W.2d 414, 417 n.3 (Tex. 1993); *Hollifield v. Hollifield*, 925 S.W.2d 153, 155 (Tex. App.—Austin 1996, no writ). The trial court's determination on child support is governed by chapter 154 of the family code. *See* Tex. Fam. Code Ann. §§ 154.001-.309 (West 2008). Particularly applicable in this case, section 154.066 of the family code allows a trial court to apply the child support percentage guidelines based upon earning potential if the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment.

13

*Id.* § 154.066;[5] *In re Striegler*, 915 S.W.2d 629, 638 (Tex. App.—Amarillo 1996, writ denied). A parent with the ability to find gainful employment cannot evade his support obligation by voluntarily remaining unemployed or underemployed. *McLane v. McLane*, 263 S.W.3d 358, 362 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *Tenery v. Tenery*, 955 S.W.2d 337, 340 (Tex. App.—San Antonio 1997, no pet.).

The evidence in the record supports the trial court's finding that James was intentionally unemployed or underemployed and that his earning potential was no less than $5,000 per month. James testified that he was not disabled and that he voluntarily quit his job in January 2006, which paid over $100,000 per year. We conclude there was no abuse of discretion in the trial court's decision to apply the percentage guidelines based on James's earning potential. *See* Tex. Fam. Code Ann. § 154.066; *see also McLane*, 263 S.W.3d at 362; *Tenery*, 955 S.W.2d at 340.

We likewise reject James's argument that the trial court was required to find that his voluntary unemployment was for the primary purpose of avoiding child support before setting child support based upon his earning potential as opposed to his actual income. In support of this argument, James relies on the holdings of our sister courts of appeals in *McLane*, 263 S.W.3d at 362, and *In re P.J.H.*, 25 S.W.3d 402, 405-06 (Tex. App.—Fort Worth 2000, no pet.). But this Court has declined to adopt the reasoning of our sister courts. In *Hollifield v. Hollifield*, finding that

---

[5] Section 154.066 states:

> If the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment, the court may apply the support guidelines to the earning potential of the obligor.

Tex. Fam. Code Ann. § 154.066 (West 2008).

unemployment was but one of myriad factors a court could consider when exercising its broad discretion to determine child support obligations, this Court held that "[s]ection 154.066 does not require the court to consider whether the obligor's 'voluntary unemployment' was for the primary purpose of avoiding child support." 925 S.W.2d at 156. This Court's holding in *Hollifield* is consistent with the plain language of section 154.066, and we decline to revisit that holding here. We overrule James's first issue.

### *Division of Marital Estate*

In his second issue, James complains that the trial court abused its discretion in making an unjust division of the marital estate. James's complaint that the trial court's division was unjust is based primarily upon the trial court's use of the appraised value provided by Jerilyn's expert, Stephen Flynn, for the property located at 130 Elm Hollow, San Marcos, Texas—the parties' primary residence before the divorce. In contrast to the appraised value provided by Mr. Flynn, James presented the testimony of his own expert witness, Randy Posey, who appraised the property in question at a higher value than Mr. Flynn.

Mr. Flynn testified at trial that he conducted an appraisal of the property located at 130 Elm Hollow and that, as of November 3, 2006, the property value was $247,000. He further testified that the values of properties in that area had appreciated approximately 5% between the date of his original appraisal and the trial in 2008. In addition to Mr. Flynn's testimony, Mr. Posey testified that he conducted an appraisal of the same property and that the value as of December 8, 2006, was $275,000. Mr. Posey also testified that he updated his appraisal just before trial and, at that time, the value would have been $285,000 based upon more recent comparable

15

sales. Mr. Posey testified that the increase in value from 2006 to 2008 was approximately 3.6%. He further testified that the difference between his appraised value and that of Mr. Flynn was based primarily on the difference in their original appraisals in 2006, and not the appreciation between 2006 and 2008.

A trial court is obligated to make a just and right division of the marital estate in rendering a final decree of divorce. *See* Tex. Fam. Code Ann. § 7.001 (West 2008);[6] *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.). A just and right division must have due regard for the rights of each party and their children. *See* Tex. Fam. Code Ann. § 7.001; *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 139 & nn.1-2 (Tex. 1977). Although a trial court need not divide the community estate equally, its division must be equitable. *O'Carolan*, 71 S.W.3d at 532; *Schuster v. Schuster*, 690 S.W.2d 644, 645 (Tex. App.—Austin 1985, no writ).

Based on the evidence in the record, we conclude there was no abuse of discretion in the trial court's division of the marital estate. The evidence showed that in 2006 James withdrew $85,000 from his retirement accounts, which were part of the community estate, but that he could only account for approximately $45,000 of these withdrawals even though he testified that he was

---

[6] Section 7.001 of the family code states:

In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage.

Tex. Fam. Code Ann. § 7.001 (West 2008).

16

the only person with access to his retirement accounts.[7]  In addition to the failure to account for the full amount of these withdrawals, James provided no explanation for the approximate $100,000 decrease in the balance of his retirement accounts from June 2006 until the time of trial in 2008 other than to say that it was based on market fluctuations.[8]  The trial court was free to consider all of this evidence, or the lack thereof, in making a just and right division of the marital estate.  *See* Tex. Fam. Code Ann. § 7.001.

In making its determination of a just and right division, the trial court stated that it took the following factors into account:

a.  fault in the breakup of the marriage;

b.  fraud on the community;

c.  benefits the innocent spouse may have derived from the continuation of the marriage;

d.  the spouse to whom conservatorship of the children is granted;

e.  needs of the children of the marriage;

---

[7]  Jerilyn testified that $45,000 of the $85,000 in withdrawals was used to pay off the liens on James's vehicle, Jerilyn's vehicle, and the Kubota tractor awarded to James in the final divorce decree.  In contrast, James testified that the total value of these three liens was $28,000 and that he used the remaining $60,000 to pay bills, living expenses, property taxes, and income taxes. Regardless of whether the trial court accepted Jerilyn's or James's testimony on the value of these liens, there remains a substantial portion of the withdrawals that was unaccounted for.

[8]  The trial court found that the total balance in James's three retirement accounts was $202,097.77 on June 20, 2006, and that the value of those same accounts had been reduced to $98,869.80 on February 5, 2008, shortly before trial.  Of this $100,000 decrease, James testified only to his $10,000 withdrawal in September 2006 and his $20,000 withdrawal in 2007.  There was no evidence or explanation beyond James's statement of "market fluctuations" to account for the remaining decrease.

17

f.      community indebtedness and liabilities;

g.      wasting of community assets by [James];

h.      attorney's fees to be paid;

i.      increased costs of the litigation of this case resulting from [James]'s repeated violation of the orders of this Court;

j.      [James]'s violation of the standing order of this Court regarding expenditures during the pending of the divorce, including monies spent by [James] on the construction of a fence and corral on the acreage at 501 Winding Trail, Wimberley, Texas;

k.      [James]'s failure to adequately provide for the support of the children during the pendency of the divorce; and

l.      undue financial burden placed upon [Jerilyn] to support the family and pay necessary expenditures during the pendency of the divorce.[9]

In making its determination of a just and right division of the marital estate, the trial court was the sole judge of the witness's credibility and the weight to be given that testimony. *McGalliard*, 722 S.W.2d at 696. And the trial court was free to accept or reject the testimony of each witness in whole or in part and to resolve any inconsistencies in the testimony. *Id.* at 697. The

---

[9] To the extent James argues that the trial court's consideration of these factors was irrelevant, or that there was no evidence in the record to support the trial court's consideration of these factors, we find his argument to be without merit. The record reflects that James voluntarily quit his six-figure job and that this unilateral decision led to the break-up of the marriage. The record further reflects that James's decision placed an undue financial burden on Jerilyn's ability to support the family and pay expenses during the pending divorce. James testified that he was not disabled or unable to work and that he spent $40,000 of the community funds in his retirement accounts to pay his attorney's fees. The evidence in the record also reflects that James repeatedly violated the trial court's orders, withdrew and spent community funds without accounting for such expenditures, and thereby failed to adequately provide for the support of his children during the pending divorce. We therefore conclude that the record supports the trial court's consideration of the enumerated factors in making a just and right division of the marital estate.

trial court thus acted within its discretion to accept the testimony of Mr. Flynn and reject the testimony of Mr. Posey when making a just and right division of the marital estate. Because there is probative and substantive evidence in the record that supports the trial court's order, we conclude there was no abuse of discretion in the trial court's division of the marital estate. *See Zeifman*, 212 S.W.3d at 587; *McGuire*, 4 S.W.3d at 384. We overrule James's second issue.

***Child Custody and Possession***

In his third and final issue, James complains that the trial court abused its discretion in failing to appoint him as joint managing conservator with periods of standard unsupervised possession. James's argument is based primarily upon the rebuttable presumption in section 153.131 of the family code that the appointment of both parents as joint managing conservators is in the best interest of the children. *See* Tex. Fam. Code Ann. § 153.131(b) (West 2008).

The trial court entered the following findings of fact with regard to possession and conservatorship:

5. It is in the best interest of the children that JERILYN TRIJE ILIFF be appointed the sole managing conservator of the children with those rights and duties granted in the decree, and that JAMES DERWOOD ILIFF be appointed the possessory conservator of the children.

* * *

6. The periods of possession between JAMES DERWOOD ILIFF and the minor children ordered in the Final Decree vary from the Standard Possession Order for the following reasons:

1. JAMES DERWOOD ILIFF has had very infrequent physical contact with the children since the separation of the parties on June 20, 2006, and the final hearing on the divorce. He has physically visited with

19

the children approximately four (4) times in a period of almost twenty-two (22) months between the separation and the final hearing.

2.    The parties on June 8, 2007, reached a mediated settlement agreement on temporary orders that was later reduced to an order signed by the Court on June 12, 2007. Said mediated settlement agreement and order are part of the evidence in this case. In that mediated settlement agreement and temporary order, the parties were to participate in an interview with Dr. Caryl Dalton, a psychologist in Austin, Texas. After that interview, each party was required to participate in good faith in any further evaluation or testing recommended by Dr. Dalton and pay the cost of the same. The parties were to follow the recommendations of Dr. Dalton regarding visitation between JAMES DERWOOD ILIFF and the children after any recommended evaluation until further order of the Court. Dr. Dalton made no recommendation for further evaluation of JERILYN TRIJE ILIFF and recommended further evaluation of JAMES DERWOOD ILIFF.

3.    The Court finds that on August 20, 2007, Dr. Dalton made a written recommendation that is part of the evidence in this case that JAMES DERWOOD ILIFF undergo both a neuropsychological examination and a neurological evaluation.

4.    The Court finds that even though JAMES DERWOOD ILIFF eventually underwent the neurological examination, he repeatedly failed to undergo the neuropsychological evaluation that had been agreed to and ordered.

5.    The parties entered into a Rule 11 Agreement in open court that was reduced to writing and filed with the Court on January 30, 2008, requiring JAMES DERWOOD ILIFF again to complete the evaluations recommended by Dr. Caryl Dalton. This Rule 11 Agreement was further set out in an Agreed Order of the Court entered on February 14, 2008. Said Rule 11 Agreement and Order are part of the evidence in this case.

6.    The Court finds that even after having agreed to and been ordered twice to perform the neuropsychological evaluation, JAMES DERWOOD ILIFF refused again to participate in the examination by Dr. David Tucker of Austin, Texas, and went to trial without ever complying with the court ordered neuropsychological evaluation.

20

7.    The Court further heard testimony from Dr. Caryl Dalton at trial, which included her recommendation regarding the need for a nueropsychological evaluation of JAMES DERWOOD ILIFF, the refusal of JAMES DERWOOD ILIFF to participate, and her recommendation regarding limited contact between JAMES DERWOOD ILIFF and the children until after the evaluation had been performed.

8.    The Court finds from the evidence and testimony that JAMES DERWOOD ILIFF demonstrated a history of bizarre and unusual behavior in the presence of his wife and family. This included paranoid behavior in which JAMES DERWOOD ILIFF believed his employer was monitoring him by satellite. The testimony further showed that during a hospitalization in May 2006, JAMES DERWOOD ILIFF had to be restrained for approximately five (5) days due to delusional behavior. The evaluation of Dr. Robert Izor, neurologist, which was admitted into evidence, reflected a diagnosis of paranoia along with a diagnosis of psychogenic movement disorder. The record further reflected that Dr. Izor recommended that JAMES DERWOOD ILIFF take anti-anxiety medication, which JAMES DERWOOD ILIFF refused. . . .

9.    Given evidence of the history of JAMES DERWOOD ILIFF's behavior, his repeated failure to obey the orders of the Court for a neuropsychological evaluation and the recommendations of Dr. Caryl Dalton, it is found that the standard possession order is not appropriate and not in the best interest of the children, and that the court ordered neuropsychological evaluation of JAMES DERWOOD ILIFF and restricted access to the minor children until its completion is in the best interest of the children.

Section 153.131(a) of the family code provides for the appointment of a child's parents as joint managing conservators, unless the court finds the appointment would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development. Tex. Fam. Code Ann. § 153.131(a). The trial court expressly found that it would not be in the best interest of the children to appoint James as joint managing conservator

21

and that his visitation with the children should be restricted until after he completed the court ordered neuropsychological exam recommended by Dr. Dalton. The trial court's findings were based on James's history of bizarre and unusual behavior.

The evidence at trial supports the trial court's findings. Jerilyn testified that James believed that people were reading his faxes and monitoring the family cell phones and all company equipment. Jerilyn also testified that James thought people were spying on him through skylights and that he believed Jerilyn's attorney had hired people to watch him. The evidence at trial confirmed that James had repeatedly violated the trial court's orders to undergo a neuropsychological exam as recommended by Dr. Dalton and that he did not complete this evaluation before trial. Dr. Dalton also testified that the children had fears regarding their visits with James and that she could not recommend either overnight visitation or visitation outside the local San Marcos area.

James testified that although he requested the standard possession order, he did not know if this would be possible given his travel schedule. The record showed that James lived in the Dallas area with his mother and that he was traveling to central Texas about once a month to work on the property in Wimberley. James also proposed that a "mutually agreed to third party" serve as the method of communication between himself and Jerilyn regarding the children. When asked if he could use e-mail to communicate directly with Jerilyn, James stated, "I don't know . . . [t]he only two that I've received from her in the last two years were not positive and not cordial or civil." Dr. Dalton confirmed that the relationship between James and Jerilyn was tense when she testified that James told her he never wanted to be in the same room with Jerilyn or see her again. The

evidence further showed that in the two-and-a-half years between the separation and the final hearing, the parties had one "second and a half" phone call and one voice mail message.

A trial court has broad discretion in deciding child custody issues. *Gillespie*, 644 S.W.2d at 451; *In re J.R.D.*, 169 S.W.3d 740, 742-43 (Tex. App.—Austin 2005, pet. denied). The best interest of the child is always the primary consideration when determining issues of conservatorship and possession. Tex. Fam. Code Ann. § 153.002 (West 2008); *Brook v. Brook*, 881 S.W.2d 297, 298 (Tex. 1994). The determination of conservatorship issues is "intensely fact driven," *see Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002), and we will not disturb the trial court's child-custody decision unless the record as a whole shows the trial court abused its discretion, *see In re J.R.D.*, 169 S.W.3d at 743.

Although there is a rebuttable presumption that both parents should be appointed joint managing conservators, on this record, we cannot say that the trial court abused its discretion in appointing Jerilyn as sole managing conservator with James as possessory conservator. *See Lenz*, 79 S.W.3d at 19; *Gillespie*, 644 S.W.2d at 450-51. Nor can we say that the trial court abused its discretion in restricting James's visitation with the children until after he completed the court-ordered neuropsychological evaluation recommended by Dr. Dalton. *See Lenz*, 79 S.W.3d at 19; *Gillespie*, 644 S.W.2d at 450-51. There is sufficient probative and substantive evidence in the record to support the trial court's determinations of custody and possession. *See Gillespie*, 644 S.W.2d at 451. We overrule James's third issue.

## CONCLUSION

Having considered and overruled James's issues on appeal, we affirm the trial court's judgment.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   July 21, 2009