# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00876-CV

---

**Edward Navarro, Appellant**

**v.**

**Erica Nichole Nunn, Appellee**

---

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-16-005526, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Edward Navarro appeals from the trial court's order limiting his access to and possession of his daughter "Kelly," who was four years old at the time of the final hearing.[1] Under the final order, the child's mother, appellee Erica Nichole Nunn, was appointed sole managing conservator, while Navarro was appointed possessory conservator and awarded supervised visitation. We affirm the trial court's final order.

## STANDARD OF REVIEW

When a trial court is deciding issues of conservatorship, possession, and access, its primary consideration is always the child's best interest. Tex. Fam. Code § 153.002; *Brook v. Brook*, 881 S.W.2d 297, 298 (Tex. 1994). The determination of such issues is "intensely fact

---

[1] For the sake of the child's privacy, we will refer to her by a pseudonym.

driven," *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002), and we will not disturb a trial court's decisions unless the record shows that the court clearly abused its discretion, *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Iliff v. Iliff*, 339 S.W.3d 126, 133 (Tex. App.— Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011); *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.— Austin 2005, pet. denied). We will not substitute our judgment for that of the trial court, *Iliff*, 339 S.W.3d at 133-34, which is in "a better position to determine what will be in the best interest of the child since it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent," *J.R.D.*, 169 S.W.3d at 743.

In reviewing a ruling under an abuse-of-discretion standard, we uphold the ruling unless the appellant demonstrates that the trial court acted arbitrarily or unreasonably or without reference to guiding rules and principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Iliff*, 339 S.W.3d at 133. A trial court does not abuse its discretion if some probative and substantive evidence supports its order. *Iliff*, 339 S.W.3d at 134. When considering the kinds of issues raised in this appeal, our traditional sufficiency standards of review overlap the abuse-of-discretion standard, requiring us to conduct a two-pronged inquiry, first asking whether the trial court had sufficient information upon which to exercise its discretion and next asking whether the court erred in its application of discretion. *Id*. "A traditional sufficiency review comes into play with regard to the first question, and we must then determine whether, based on the evidence, the trial court's decision was reasonable." *Id*.

There is "a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child" unless the trial court finds such an appointment would not be in the child's best interest. Tex. Fam. Code § 153.131. The section 153.131 presumption does not apply if credible evidence is presented of one parent's

2

history or pattern of past or present child neglect, or physical or sexual abuse against the other parent, a spouse, or a child. *Id.* § 153.004; *see also id.* § 153.131(a). It is further presumed that a possessory parent should be given periods of possession of his child pursuant to the standard possession order. *See id.* § 153.252. If a court deviates from the standard possession order, it:

> must render an order that grants periods of possession of the child as similar as possible to those provided by the standard possession order if the work schedule or other special circumstances of the managing conservator, the possessory conservator, or the child, or the year-round school schedule of the child, make the standard order unworkable or inappropriate.

*Id.* § 153.253. In fashioning a non-standard possession order, the court should consider the guidelines established by the standard possession order and may also consider the child's age, developmental status, circumstances, and needs; the parents' circumstances; and "any other relevant factor." *Id.* § 153.256.

## PROCEDURAL AND EVIDENTIARY SUMMARY

Kelly was born to Nunn and Navarro in February 2015. In September 2016, after the parents broke up and Nunn moved out, Navarro filed a petition seeking to be named Kelly's sole managing conservator. In December 2016, the trial court signed temporary orders naming the parents temporary joint managing conservators and setting out a "5-2-2-5" visitation schedule for Navarro. In May 2017, Nunn filed a motion for further temporary orders stating that the parties had developed their own visitation schedule rather than following the 5-2-2-5 schedule but that Navarro had abruptly asked that they revert to the 5-2-2-5 schedule. She further asserted that Navarro was refusing to use Kelly's "state sponsored day care," which required attendance

3

five days a week.  In November 2017, the trial court signed agreed further temporary orders, ordering the parties to comply with the daycare provider's attendance requirements.

While the case was pending, the trial court appointed a guardian ad litem to determine Kelly's best interest.  The guardian ad litem filed two reports, one in January 2018 and one in September 2018.  In both reports, she recommended that the parents be named joint managing conservators and that the existing possession schedule be continued until Kelly was old enough to enroll in school, at which point the extended standard possession order should apply, and stated that "[s]upervised visits are not warranted with either parent at this time."  The reports differed in their recommendations on which parent should designate Kelly's primary residence—in January, the guardian ad litem recommended Navarro, and in September, she changed her report to recommend that Nunn designate Kelly's primary residence.  No explanation was provided for the change, but the ad litem did explain that she initially believed Navarro was being proactive in taking Kelly to the doctor to address her medical needs but that after further investigation, concerns about Navarro had arisen.  She noted that Navarro made "numerous allegation[s] of sexual abuse . . . that were not substantiated by medical professionals," that Navarro's persistence in making his allegations while "fail[ing] to report other vital medical information" led Kelly to undergo two sexual-assault examinations, and that Navarro would benefit from therapy to "work on emotionally separating himself from Ms. Nunn and resisting the instinct to go beyond what is appropriate of an ex-spouse."

In October 2018, Nunn filed a counter-petition alleging that Navarro "has a history or pattern of committing family violence during the two-year period preceding the date of filing of this suit."  She asked that if the court determined that allowing Navarro access to Kelly would be in the child's best interest, he be awarded possession under an order "designed to

4

protect the safety and well-being of the child and any other person who has been a victim of family violence," including but not limited to requiring exchanges to occur in a protective setting and ordering Navarro to complete a battering intervention and prevention program. Starting in December 2018 and continuing through March 2019, Nunn filed several motions for enforcement of temporary orders alleging that Navarro had not delivered Kelly to daycare or paid child support on multiple occasions and that he had interfered with Nunn's possession at least twice. In April 2019, Nunn filed a motion for additional further temporary orders, asserting that Navarro "has continually interfered with [Nunn's] access and possession of the child and exhibited behavior that may be a threat to the health and safety of the child." She also alleged that Navarro had "continually refused to bring the child to the daycare," that he had "made several false claims regarding the daycare," and that he had made multiple false claims to child protective services (CPS) about Nunn, all of which had been ruled out. Nunn asked that Navarro's possession be supervised until a final order was rendered and stated that Navarro "continually takes [the child] to Corpus Christi, and may do so and not return the child." She eventually filed a proposed disposition of issues that included a request for supervised visitation until Navarro completed at least one year of therapy "to work on his emotional issues."

At the final hearing on September 30, 2019, the trial court heard testimony by Nunn, Navarro, CPS investigator Stephanie Lovelace, and guardian ad litem Marlyn Martinez. Nunn explained that she had initially agreed with the guardian ad litem's recommendations but that, "based on his behavior over the last three months, or two months, three months," Nunn now wanted to be the child's sole managing conservator and for Navarro "to have supervised visitation until he gets some kind of therapy or counseling for his emotional issues or whatever is going on in his particular life."

5

Nunn testified about the early days of her relationship with Navarro, asserting that after Kelly was born, the relationship got "worse and worse" and Navarro became "verbally abusive to me, mentally abusive. He would talk down to me all the time, tell me how bad of a mother I was and that I was a whore . . . ." Nunn asserted that when she lived with Navarro after Kelly was born, she was without access to a vehicle or to "a phone or a computer or online access." She said that by the time Kelly was about eighteen months old, she "just didn't want to take it anymore," so she left and took Kelly to Washington state to be with her family. They returned to Texas after Navarro filed his suit.

Nunn explained that because she lived in Driftwood and worked in central Austin, while Navarro lived in north Austin, she and Navarro had agreed on a centrally located daycare provider. However, Nunn testified, Navarro had violated the trial court's temporary orders by repeatedly failing to bring Kelly to that daycare, resulting in more than sixty-five absences between June 2018 and February 2019, Nunn being charged $175 a month by Childcare Management Services, and the family being "thrown out of" the daycare program. Nunn testified that on days that Navarro did not bring Kelly to the agreed daycare, she would ask him where the child was, and Navarro would respond, "Well, she's with me," or, "She's in another daycare." He also told Nunn, "As her primary parent I will decide where she goes to school," and Nunn testified that Navarro had claimed to be Kelly's "primary parent" to various service providers, for instance, Childcare Management Services and the child support office, causing problems for Nunn when she tried to communicate with the service providers. Nunn said that at the time of the hearing, Kelly was going to a daycare near Navarro's home, which Navarro had chosen without consulting Nunn. Nunn wanted Kelly to return to the centrally located daycare on which the parties originally agreed.

Nunn testified that Navarro had refused to return Kelly to Nunn between March 18 and April 4, and again shortly before the hearing. Nunn said that she had last seen Kelly on August 21, when she dropped off the child at the agreed-upon daycare, and that Navarro had since kept the child, refusing to return her to Nunn despite Nunn's texting Navarro "every day, when and where can I pick her up."

Nunn further testified that Navarro had not complied with the trial court's child support orders, paying only "sporadic[ally]" and "$50 here, [$]250 there." She also alleged that Navarro had repeatedly reported her to CPS, saying, "I sure did get knocks on my door from CPS quite a few times. And I did everything they wanted me to do and they were like, this is ridiculous. Why is he not giving you your kid back?" Nunn testified that she wanted to vaccinate Kelly, but because Navarro disagreed, Nunn did not "feel comfortable doing it because he's just going to start some fight or call CPS on me again and say that I'm abusing her." She wanted to get along with Navarro for Kelly's sake, "[b]ut if dad doesn't get help for himself, I don't see that happening." She and Navarro took six weeks of parenting classes in January 2017, and Nunn said she "learned a lot" but did not "see any progress from Mr. Navarro at all."

Nunn testified that she did not "really have any issue with" Navarro and that "[a]pparently his issue is with me." Nunn said that Navarro "indicated all the time that I'm a bad mother; that I shouldn't have our daughter and I don't deserve her." She testified that she thought Navarro "needs mental help" because:

> he acts very erratically, he's not very consistent with our daughter, he moves once a year. He's just very inconsistent with everything that he does. Like moving her around from daycare to daycare, moving her around to place to place. Like he's moved three times in the past three years. I've held the same place for three years. You know, that he wants to talk about consistency and all of that, I'm

7

sorry, I just don't see it from him, excuse me.

Nunn said she believed Navarro posed a danger to her because "he's abusive to me, mentally and emotionally" and because "he still talks down to me. He treats me like I'm dirt on his feet. Like he's so much better than I am. I don't deserve his child support, I don't deserve to take care of his child. He's very possessive with her." Asked whether Navarro posed a danger to Kelly, Nunn said, "I don't really know." Nunn limited her communications with Navarro to texts and refused to speak to him "because he just verbally abuses me. I really don't feel like putting up with that. I shouldn't have to." She did not believe she and Navarro could be joint managing conservators because "he's not consistent and he doesn't keep up to his word. He does what he wants to do and that's really not, you know, good in [Kelly's] sake."

Navarro questioned Nunn about bruises, bitemarks, and bullying he alleged Kelly suffered. Nunn agreed that Kelly had sometimes "show[n] up with either bruises or bites," saying, "Sure, yeah. She's a kid." She denied that she had ever kept Kelly out of school due to such issues and testified that she had never been asked by a daycare about any bruises or bites. Navarro also asked Nunn about "an incident where you slammed [Kelly] in the back of a car at the mall parking lot," and Nunn responded, "He already tried to bring this up [in an earlier hearing] and it was—has nothing to do with anything. . . . It was an accident. He's trying to make it into something that it wasn't." The police records introduced into evidence reflect that in August 2015, Navarro called the police and accused Nunn of ramming a shopping cart into a car, causing Kelly to fall from the cart. Nunn told the police that she was hurrying to leave after an argument with Navarro and struck a car with the cart in which Kelly was riding, strapped into her car seat. Kelly fell either to the ground or into the cart but did not fall out of the car seat or

8

contact the pavement. At the scene, Navarro told the police he did not think Nunn had "intentionally tried to hurt the child." However, in an interview two years later, Navarro told the police that the incident was not an accident, that he had not said it was, that Nunn had intentionally injured Kelly, and that Nunn "frequently leaves bruises on their child." Kelly sustained no injuries, and the police closed the case, noting, "It is apparent that this incident was an accident and that the mother of the child would not intentionally hurt her own child."

Navarro cross-examined Nunn about whether she had ever attended Kelly's medical appointments, and she answered, "No, because you never told me when they are." He then asked whether she had "ever done the research to find out where and how you can be a part of going to her medical appointments," and Nunn answered, "I asked you. You let me know at the very last minute: FYI, she's got a doctor's appointment today. Why didn't you let me know earlier so I could go? Because I have to go work. You've done that quite a few times."

When he was asked whether he kept Kelly from daycare starting in June 2018, Navarro initially responded, "I didn't keep her from daycare," then later answered, "There was times where she did not attend [daycare] due to the level of abuse that was occurring." Navarro refused to agree that Kelly had missed daycare on "a number of occasions," saying, "There is a few occasions. I wouldn't say a number of occasions, but there are a few." He also testified that he kept Kelly away from daycare "[p]lenty of times" because of:

> The consistency of the abuse that was occurring, either from or at the daycare or from mom. And the uninterest [sic] of listening to my daughter when she's crying out, she does not want to be hit, bullied, or abused, or she does not want to show up with bites all over her, bruises all over her leg or on her thigh, or getting chastised at home and being yelled at and being afraid to go back to school concerning the situation, it's not—it's not right.

9

So there are occasions where your child is not going to want to go to daycare, they don't want to go to daycare, if they're telling you they're not going to go and they're being hurt at that daycare, you don't want to take them to that daycare.

Asked about his withholding Kelly from Nunn, Navarro said, "I'm glad you asked. She was crying outcries of being abused." Navarro said he thought Kelly "was in danger" and therefore, "to prevent any more harm for her, I kept her those days." Navarro also asserted that Nunn "had an opportunity" to have Kelly for the disputed periods of possession:

She knows the address—yes. She knows where she goes to school, yes. She knows where I live, yes. She knows how to knock on a door, yes. She can show up at the school any time, I'm her mother, like she's already done before, and pick her up. But to answer that question fully, she has done none of these things. She's offered every chance every ample time to show up there, let's go.

Navarro said he "make[s] it a point to provide ample information and everything you could possibly need to facilitate [Kelly] with her education, medical, wellness, um, place of pickup, things of that nature" and claimed he had listed Nunn on the new daycare's paperwork as "a person to be—that is able to pick up [Kelly]. She can drop her off, pick her up at any time. She has not made any effort to drop her off or pick her up at any time. Instead of—instead of just complete silence in that." However, Nunn disputed Navarro's assertions, testifying:

I called the school, I went to the school. He knows that I get off of work at 4:00, I've worked at the same job for the past three years. He knows my schedule in and out, because he's had to drop her off there and pick her up there and what have you. He knows that I don't get out of work until between 4:00 and 4:30 every day. By the time it takes me to get from my job to that school all the way up north it takes about 30 to 45 minutes. By the time I get there it's past 5:00. I don't know where to go, the door is locked, there's nobody there. I try to call, nobody answers the phone.

Navarro was asked about Nunn's texts asking where Kelly was and when she could pick her up. He initially denied several times that he had refused to tell Nunn the child's whereabouts then eventually admitted he "didn't respond, because she already knows the answer to that question."

Navarro alleged that Nunn had his utilities shut off, asked her friends to break into his apartment, arranged to have him assaulted, and "gaslighted" and "catfished" him. He testified that Kelly twice got pneumonia and that Nunn simply dropped Kelly off with Navarro rather than taking her to the emergency room. He said that "every time I get [Kelly] back there's always something wrong with her. Continuously. And I mend her back up, put band-aids on her, whatever needs. But then again something else comes up that even looks more concerning with heavy-handed grabs and her outcries." Finally, Navarro testified that Nunn had orally agreed to switch Kelly to her current school and that Kelly was thriving at the school.

CPS investigator Stephanie Lovelace testified that she was assigned to the family in August 2019 in response to allegations that Kelly had been physically abused. Lovelace looked at a bruise above Kelly's knee and spoke to Kelly, Navarro, and the school nurse, and decided Kelly was "a good candidate for a forensic interview." Lovelace testified that she spoke to Navarro about the interview, "specifically ask[ing] him not to have a conversation with [Kelly] about where she was going, what was going to happen" during the interview. However, when Navarro brought Kelly for the interview, she "was cheerful" and "appeared happy" and "reported immediately when she came . . . that she came here today to talk about her mommy hitting her with a yellow hairbrush that stings." Thus, Lovelace "had some concerns that [Kelly] had been spoken to prior to being brought to the facility for her to be interviewed." Lovelace testified that she spoke to Nunn about Kelly's outcry of being struck with a hairbrush, and that Nunn had denied using physical discipline. Lovelace said her investigation was being closed as

11

"Unable to Determine on" Nunn "because we just feel like there's been a lot of probing and questioning of [Kelly] by her father, and . . . we just feel like basically a lot of information has been given to [Kelly] and we are unable to determine what happened." Lovelace testified that the family "had quite an extensive history" with CPS and that none of the allegations have resulted in a "reason to believe" finding, saying:

> [B]asically since [Kelly] was around two years old it looks like that we've had calls into intake about three, six months, making allegation about physical abuse by mom, sexual abuse, neglectful supervision. It looks—looks like some of the investigations have resulted in rule-outs on those allegations, some of them have been administratively closed before they've ever been stage progressed to a full investigation. And it looks like most of them have been ruled out over the years.
>
> The department has some concerns that this is basically a custody situation and somehow we are in the middle of it.

Lovelace testified that CPS had concerns because Kelly is "consistently probed for information," "videoed repetitively," and subjected to "ongoing photographs," stating, "[I]t concerns me that that information is being gathered in order to build some type of custody case that is in that party's best interest, you know, by essentially using [Kelly] as a basis for information." She further said she had concerns about Navarro's parenting because of "the number of photographs and videos that I had seen of [Kelly] being asked repetitively about marks and bruises." Lovelace testified that Nunn had been "very cooperative with the department, we have not had any concerns with her."

Guardian ad litem Marlyn Martinez testified that she thought Navarro was "very proactive in taking [Kelly] to the doctor due to diaper rash and . . . the medical attention that she was needing." She also said Navarro had a safe, appropriate home and was engaged and positive

12

with Kelly. However, Martinez testified, Navarro was insistent that Kelly had been sexually abused although "the medical staff didn't deem that that was necessary" and "was just so persistent that he . . . went like to another place to try to have [Kelly], you know, examined. So there were—I believe there was a total of two [sexual assault] exams completed on [Kelly] due to all of this persistence." Martinez testified about CPS's involvement and concerns:

> I believe it was more about the child abuse, concerns that you were persistent in getting looked into; at times when she was being taken to the doctor. Also the fact that the first [sexual assault exam] resulted with no evidence and you persisted on a second one. And I think that was their concern, that if this is what you're telling [Kelly], she's actually—will probably grow up believing that her mother was abusing her. And that was not the information, not the message we're trying to give [Kelly].

Martinez testified about the parents' psychological evaluations and said that for Navarro, "some type of an engagement in structure, behavioral focus, parenting skills and stress management skills development class" was recommended to "assist Mr. Navarro in formulating more developmentally-appropriate expectations for his child because of the, you know, the constant, constant doctor's appointments." The evaluation also recommended individual outpatient counseling for Navarro, "to increase coping skills, stress management, and improve relaxation skills"; that Navarro engage in family therapy with Nunn, "to increase communication skills and bond as coparents"; and that both Nunn and Navarro take a Domestic Violence Prevention class. She did not know if Navarro or Nunn had followed those recommendations.

Martinez had recommended in her most recent report that Nunn should determine Kelly's primary residence, the parents should have joint managing conservatorship, and Navarro should have visitation under a 2-2-5 schedule. At the hearing, she was asked if she would change her recommendations if she learned that Navarro had twice withheld Kelly from Nunn,

that he had done so because he believed she was being abused, and that CPS had ruled out the allegations. Martinez answered that those facts would change her recommendation and that she "would probably then have Mr. Navarro have supervised visits."

At the conclusion of the hearing, the trial court said:

> It's clear to me that you both love your daughter very much. That is the positive from today's evidence. The negative is that something is wrong, Mr. Navarro, with the way you interpret what I believe are probably normal bruises on a four-year-old child. And with the way you are apparently single-mindedly pursuing allegations that doctors and professionals continue to tell you are not based in reality.

> I don't know what happened and why things aren't okay now. I heard from Miss Nunn, her opinion on when they went wrong. They were okay before then, and that she would like to proceed like a normal family. But I don't think that you guys can do that right now. I'm hopeful that you will get some help.

> I wasn't being flippant when I said earlier that I think probably everyone in this family needs some therapy. You've been in court for three years, which is an incredibly long time. That causes trauma on everybody, even if it were a happy ending. So I encourage everyone to seek out all of the low-cost or free services that you can find for yourself and for your daughter. But I am going to issue orders that leaves one of you very unhappy, because I do not think that the two of you can coparent effectively at this time.

> I do not believe [the] standard possession order is workable or appropriate under these circumstances. Unfortunately, Mr. Navarro, I am quite concerned about your conversations with [Kelly], and so at this time I do not believe unsupervised access to [Kelly] is in her best interest for you.

The trial court then signed its final order, awarding Nunn the right to designate Kelly's primary residence, limiting Navarro's visitation, and specifying that the standard possession order "is unworkable or inappropriate under the circumstances and not in the best interest of" Kelly.

14

**DISCUSSION**

Navarro asserts that the trial court erred in (1) requiring supervised visitation and (2) naming Nunn as sole managing conservator. In both issues, we ask whether the evidence was sufficient for the trial court to exercise its discretion in concluding that the usual presumptions—in favor of joint managing conservatorship and against supervised visitation, *see* Tex. Fam. Code §§ 153.131, .252—should not apply and whether the court erred in applying its discretion, *see Iliff*, 339 S.W.3d at 134. If some probative and substantive evidence supports the court's order, we will not find an abuse of discretion. *Iliff*, 339 S.W.3d at 134.

Navarro insists that Nunn did not rebut the family code's presumptions and that "[t]he fault attributed to Mr. Navarro was that he was too proactive with regard to doctor's and medical visits, and that the [trial court] believed he was having discussions with the child that were concerning, but these do not rise to the level to remove his fundamental right to be a participant and managing conservator." However, that characterization of the evidence is not accurate. Instead, the trial court heard evidence that Navarro had refused to give Kelly to Nunn for her periods of possession; made multiple accusations of abuse against Kelly, all of which had been ruled out; accused at least one daycare provider of abusing Kelly; violated the court's temporary orders in several ways; was insulting to Nunn; and refused to cooperate with Nunn or respond when she asked where Kelly was during the times he withheld the child from her mother. There was evidence that Navarro told Kelly negative things about Nunn to alienate the child from her mother and that his fixation on the idea that Nunn was abusive led the young child to endure two sexual-assault exams. The court also heard the CPS investigator's and guardian ad litem's concerns about Navarro's "persistence" in insisting that Nunn was abusive and how that behavior might adversely impact Kelly, and Navarro's psychological evaluation recommended

15

that he engage in therapy and other services to improve his coping and parenting skills. Although the trial court did not find a pattern of family violence by Navarro, *see* Tex. Fam. Code § 153.004, Nunn testified that he was abusive and that she believed he posed a danger to her.

"Factors that courts have cited in support of their decisions to limit a parent's possession and access to her child to supervised visits include the parent's inability to follow court orders, attempts to alienate the child from the other parent, and actions that improperly deny the other parent contact with the child." *Trevino v. O'Quinn*, No. 03-18-00197-CV, 2019 WL 4125125, at \*4–5 (Tex. App.—Austin Aug. 30, 2019, no pet.) (mem. op.). Although Navarro disputed much of Nunn's testimony, it was for the trial court to evaluate the witnesses and determine the credibility of their testimony.[2] *See J.R.D.*, 169 S.W.3d at 743. On this record, the trial court had sufficient evidentiary support for concluding that Navarro's apparent fixation on the idea that Nunn or others were abusing Kelly—to the possible detriment of Kelly's well-

---

[2] The trial court could have noted how often Navarro seemed combative or evasive during the hearing, as reflected in the reporter's record. *See Capellen v. Capellen*, 888 S.W.2d 539, 544 (Tex. App.—El Paso 1994, writ denied) ("[O]ur reading of the 'cold record' would support a finding by the trial court that husband in his testimony was evasive, uncooperative, less than candid, and had convenient memory lapses."); *see also Walker v. Texas Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 625 n.5 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (reporter's record reflected that father was evasive during testimony). For instance, Navarro refused to agree to the accuracy of copies of the parties' texts or to Nunn's listing of the dates Kelly missed daycare but did not explain how they were inaccurate. In another exchange, when asked whether during the fifteen days that he withheld Kelly Nunn had repeatedly texted him to ask where Kelly was and when Nunn could get her, Navarro answered, "She may have sent some text messages. Again, she—it's a rhetorical question, so." When the trial court informed Navarro that it was "not a rhetorical question" and that he had to answer, he admitted, "I did not reply." Finally, there was testimony about an accident Navarro had—Nunn testified that when Navarro called to tell her he was in the hospital, she told her boss she could not work, picked up Kelly from daycare, picked up Navarro at the hospital, drove him to a store for bandages and other supplies, paid for some of the supplies, and drove back to his residence the next day to help change his bandages. Navarro agreed that Nunn had helped him in those ways but said, "I felt like I was being taken advantage of . . . . I could have easily caught a Lyft or something . . . . I mean I know I appreciate that, but at the same time there was a little—there was a manipulation that caused me to be taken advantage of in that way."

being—and his hostility toward Nunn, his refusal to comply with court orders, and the parties' circumstances as a whole made joint managing conservatorship and visitation under the standard possession order unworkable. *See Iliff*, 339 S.W.3d at 140 (upholding trial court's order where, "based on [father's] history of bizarre and unusual behavior," court found that joint managing conservatorship was not in children's best interest and that visitation should be restricted until father completed court-ordered psychological exam). Navarro has not shown that the trial court abused its discretion in making its rulings on conservatorship and visitation. We overrule Navarro's two issues on appeal.

## CONCLUSION

Because the evidence is sufficient to support the trial court's limiting Navarro's visitation and naming Nunn as Kelly's sole managing conservator, we affirm the trial court's final order.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Baker and Kelly

Affirmed

Filed: December 23, 2020

17