TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-11-00028-CV






J. Scott Loras, Appellant


v.


Susan Mitchell, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. D-1-FM-10-001499, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 The trial court ordered J. Scott Loras to reimburse his former wife, Susan Mitchell,
for expenses she incurred to send their son to an outdoor therapeutic program and then to a
residential treatment facility, both of which were for the purpose of addressing his mental-health and
behavioral issues. On appeal, Loras asserts that the trial court abused its discretion in issuing the
child-support enforcement order because (1) the evidence is insufficient to establish that the
expenses are "health-care" expenses within the meaning of the parties' amended divorce decree or
as contemplated by the Texas Family Code, (2) the expenses were incurred in a non-emergency
situation without his consent, and (3) he is entitled to an offset for other child support he paid to
Mitchell during the time their son was enrolled in the treatment programs. We will affirm.


FACTUAL AND PROCEDURAL BACKGROUND

 Loras and Mitchell were divorced in 1997. Their final divorce decree appointed both
parents as joint managing conservators for their son, A.L. Among other things, the decree specified
that both parents retained the right to (1) consent to medical treatment during an emergency
involving an immediate danger to the health and safety of the child and (2) consent on behalf of the
child to medical treatment involving psychiatric and psychological treatment. The decree also
included fairly restrictive provisions regarding reimbursement of uninsured health-care expenses
incurred on A.L.'s behalf for psychiatric and psychological treatment. Those provisions required
each party to pay 50% of such expenses for A.L. for three months after the date of the divorce
decree; thereafter, each parent was to pay 100% of the expenses for psychiatric and psychological
treatment authorized by that parent.

 In May 2007, however, following A.L.'s inpatient treatment at a Texas-based
residential treatment facility for psychological issues, Loras and Mitchell executed an agreed order
that modified the health-care provisions in the divorce decree ("Agreed Order"). The Agreed Order
included the following relevant provisions:


 1. Definitions--


 . . . .


 "Reasonable and necessary health-care expenses not paid by insurance
and incurred by or on behalf of a child" include, without limitation . . . mental
health-care services.


 . . . .


 5. Compliance with Insurance Company Requirements-- . . . Each party shall
attempt to use "preferred providers," or services within the health
maintenance organization, if applicable; however, this provision shall not
apply if emergency care is required or agreement between the parties. 
Disallowance of the bill by a health insurer shall not excuse the obligation of
either party to make payment as allocated herein.


 . . . .


 8. Health-Care Expenses Not Paid by Insurance--Subject to the provisions in
paragraph 5, immediately above, IT IS ORDERED that, if health-care
expenses are incurred for the child, [Loras] and [Mitchell] shall pay all
reasonable and necessary health-care expenses not paid by insurance and
incurred by or on behalf of the child in the following portions:


 a. If the health-care expenses are incurred by using a HMO
or PPO plan, in an emergency, or with the written
agreement of the other party, [Loras] is ORDERED to pay
fifty (50%) percent and [Mitchell] is ORDERED to pay
fifty (50%) percent. 


 b. Except in an emergency or if the other parent agreed in
writing, if a party incurs health-care expenses for the child by
using the services of health-care providers not employed by
the HMO or approved by the PPO, [Loras] is ORDERED to
pay fifty (50%) percent and [Mitchell] is ORDERED to pay
fifty (50%) percent. (1)


The Agreed Order further specified that the "reasonableness of the charges for health-care expenses
shall be presumed when a party is furnished with the applicable documents for the charges."

 In November 2007, after A.L. exhibited violent and destructive behavior and made
an outcry for assistance, Mitchell informed Loras, via email, that A.L.'s condition was rapidly
deteriorating. Loras responded that A.L. needed to leave his mother's home "ASAP." Loras was
apparently unable or unwilling to take custody of A.L. at that time, however, and Mitchell's husband
informed Loras that they would keep him posted on "when, where, and what" they would do with
A.L. About ten days after Mitchell's initial communication with Loras, she enrolled A.L. in Outback
Therapeutic Expeditions, a nine-week outdoor therapeutic camp in Utah, which Loras concedes on
appeal was an "intensely therapeutic" program with "well-defined health care elements." Loras
participated in A.L.'s therapy sessions at Outback--both in person and by telephone--and never
sought to withdraw him from the program or requested that he be withdrawn.

 Upon completion of the Outback wilderness program in January 2008, A.L.'s
therapist informed Mitchell that A.L. should not return home and should instead be enrolled in a
residential treatment facility. Mitchell communicated this information to Loras, along with a list of
six prospective facilities, as Loras had previously communicated a willingness to consider placing
A.L. in a boarding school. Loras was invited to join Mitchell in visiting the treatment centers, but
he did not respond to Mitchell's email. She subsequently informed him that A.L. had been accepted
at Discovery Ranch, a residential treatment facility in Utah. While A.L. was being treated at
Discovery Ranch from January 2008 until he graduated high school in December 2008, Loras
participated in A.L.'s therapy sessions--both in person and by telephone--and never sought to
withdraw him from the program or requested that he be withdrawn. In addition, it is undisputed that
Loras repeatedly encouraged A.L. to stay at Discovery Ranch for several months after he attained
the age of majority and could have withdrawn himself from the program.

 Although Mitchell regularly submitted invoices to Loras and requested that he
reimburse her for 50% of the expenses, Loras never reimbursed Mitchell for any expenses incurred
for A.L.'s treatment at Outback or Discovery Ranch. As a result, in April 2009, Mitchell initiated
the underlying post-divorce enforcement action regarding expenses incurred for their son's
enrollment in these programs. After a bench trial, the trial court granted Mitchell's request for
enforcement of the Agreed Order and rendered judgment against Loras for $78,659.75 in health-care
related, child-support arrearages and $11,312.87 in attorney's fees.

 On appeal, Loras presents five issues in which he asserts that the trial court abused
its discretion in rendering judgment against him.


STANDARD OF REVIEW

 "'A court's order of child support will not be disturbed on appeal unless the
complaining party can show a clear abuse of discretion.'" Iliff v. Iliff, 339 S.W.3d 74, 78 (Tex. 2011)
(quoting Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)). "A trial court abuses
its discretion when it acts arbitrarily or unreasonably, without reference to guiding rules or
principles." Id. "A trial court also abuses its discretion by failing to analyze or apply the law
correctly." Id.

 Under an abuse-of-discretion standard, legal and factual sufficiency of the evidence
are relevant factors in assessing whether the trial court abused its discretion, but they are not
independent grounds of error. Iliff v. Iliff, 339 S.W.3d 126, 134 (Tex. App.--Austin 2009), aff'd,
339 S.W.3d 74 (Tex. 2011). Accordingly, in determining whether the trial court abused its
discretion in this case, we apply a two-pronged analysis. See id. First, we must consider whether
the trial court had sufficient information on which to exercise its discretion. Id. Second, we must
determine whether, based on the evidence, the trial court's decision was reasonable. Id.

 In determining whether there is legally sufficient evidence to support a finding under
review, we examine the record for evidence and inferences that support the challenged finding,
considering evidence favorable to the finding if a reasonable factfinder could and disregarding
evidence contrary to the finding unless a reasonable factfinder could not. City of Keller v. Wilson,
168 S.W.3d 802, 827-28 (Tex. 2005). Evidence is legally insufficient only when (1) the record
discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes
conclusively the opposite of a vital fact. Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328,
334 (Tex. 1998). We will not substitute our judgment for that of the factfinder if the evidence falls
within the zone of reasonable disagreement. City of Keller, 168 S.W.3d at 822.

 Evidence is factually insufficient only if the evidence adverse to the finding at issue
preponderates so overwhelmingly against the challenged finding that the finding is clearly wrong and
manifestly unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

 As the factfinder in this case, the trial court is the "sole judge of the credibility of the
witnesses and the weight to be given their testimony." McGalliard v. Kuhlmann, 722 S.W.2d 694,
696 (Tex. 1986). There is no abuse of discretion if some probative and substantive evidence
supports the trial court's order. See, e.g., Zeifman v. Michels, 212 S.W.3d 582, 587 (Tex.
App.--Austin 2006, pet. denied).

DISCUSSION

Health-Care Expenses

 In his first and fifth issues, Loras asserts that the trial court abused its discretion in
concluding that the entire cost for Outback and Discovery Ranch qualifies as a health-care expense. 
He contends that the evidence was insufficient to establish that the expenses incurred on A.L.'s
behalf at Discovery Ranch were health-care expenses because the invoices from Discovery Ranch
refer to "tuition" and do not include itemized medical-care expenses. Loras contends that Discovery
Ranch is a "boarding school" and that neither the Agreed Order nor the Texas Family Code requires
the court to charge boarding school tuition as a medical support obligation. In the alternative, he
contends that there is insufficient evidence to determine what portion of the expenses incurred at
Outback and Discovery Ranch are health-care expenses because the total cost of care for A.L.
included non-health-care components, such as tuition, room and board, and other educational costs,
that were not segregated from legitimate health-care expenses.

 Under the Agreed Order, "mental health-care services" are included within the
definition of reimbursable health-care expenses. In Rambo v. Rambo, we previously held that
expenses for an outdoor therapeutic program and a residential treatment center for a troubled teen
were health-care expenses. No. 03-01-00257-CV, 2002 WL 24033, at *3 (Tex. App.--Austin
Jan. 10, 2002, no pet.) (mem. op., not designated for publication) (holding that sufficient evidence
supported finding that outdoor therapy program and residential treatment expenses were health-care
expenses not covered by insurance, for which father was required to pay 50% pursuant to
divorce decree).

 The factual circumstances in Rambo are similar to those in the present case regarding
the child's need for the services and the types of services rendered. As in Rambo, there is undisputed
testimony that A.L. was an emotionally troubled teen. At age seventeen, A.L. was combative,
behaving violently, and using drugs, alcohol, and tobacco. He had previously been diagnosed with
intermittent rage disorder, severe depression, and attention-deficit hyperactivity disorder. Even after
a previous stint in residential treatment in the spring of 2007, A.L.'s problems persisted and
escalated to the point that his mother and stepfather were fearful that A.L. would harm them. There
was undisputed evidence that A.L. had destroyed property, had a 10-inch military knife hidden in
his room, had injured his stepfather by throwing a rock at his head, had beaten his mother with a
broomstick, had threatened his grandmother with a dowel rod, and had previously thrown a butcher
knife at his stepfather. There were other disturbing incidents. Mitchell was so fearful of her
son's erratic behavior that she hired an off-duty sheriff's deputy to stay at her home when her
husband traveled.

 During this time, A.L. was attending outpatient therapy, and his psychiatrist and
psychologist recommended that A.L. be enrolled in a residential treatment facility. A.L.'s
psychologist contacted Loras several times to discuss this option, but Mitchell testified that, as far
as she knew, Loras never met with A.L.'s psychologist to discuss the matter. However, Loras
informed Mitchell on several occasions that he was having financial difficulties, that he wanted
to reduce counseling expenditures for his son, and that his consent was required for A.L.'s
health-care treatment.

 On November 3, 2007, A.L. was particularly out of control, destroying property and
choking Mitchell. Mitchell promptly informed Loras of these circumstances by email and told him
that A.L. had begged her for help, stating "Mom, please help me . . . I'm losing my mind . . . mom,
I'm absolutely losing my mind." Loras quickly responded via email that A.L. needed to leave his
mother's home "ASAP." Loras testified that he intended for A.L. to come live with him. However,
he never came to collect his son, and other evidence admitted at trial indicates that Loras expressed
an inability or unwillingness to take custody of A.L. for several months, if then. Consequently,
Mitchell and her husband testified that they were left to seek alternative placements for A.L. 
Mitchell's husband specifically informed Loras via email that they would be looking into other
placements and would let Loras know where A.L. would be placed. Loras did not respond. On
November 13, 2007, A.L. was enrolled in Outback to address the immediate crisis and to facilitate
his later enrollment in a residential treatment facility. On the same day, the Mitchells informed
Loras of this enrollment, and Loras did not communicate any objections or reservations to them at
that time.

 The record reflects that, at Outback, A.L. received medical and psychological services
under the direction of a physician--including a psychological evaluation, regular counseling, lab
work, drug screening, physical assessments, and prescription medications--and engaged in intensive
therapeutic activities. Loras participated in A.L.'s therapy sessions at Outback and at no time sought
to withdraw him from the program or requested that he be withdrawn. Shortly before A.L.'s
discharge from Outback in January 2008, however, Loras informed Mitchell via email that he would
not pay for any expenses incurred for A.L.'s enrollment at Outback because she had not obtained his
prior approval and consent. Loras now concedes that at the time A.L. was enrolled at Outback, he
needed acute care in a highly controlled environment, at least for a short while. Loras acknowledges
that A.L.'s treatment at Outback included significant health-care components, in addition to
schooling and room and board.

 Prior to A.L.'s discharge from Outback, his therapists advised that further intensive
treatment was essential to his recovery. His psychologist stated that he had "no business" returning
home and "under no circumstances" should he return home at that time. It was recommended that
A.L. be placed in a residential treatment center. Mitchell and Loras exchanged various emails
regarding further placements for A.L., and Mitchell forwarded Loras a list of potential placements. 
She later informed him that only three of the treatment centers would accept A.L. and invited Loras
to participate in the selection process. Loras failed to respond to Mitchell and did not offer any input
on the available opportunities. Although Loras testified that he suggested that A.L. could live with
him and go to school in Austin, the documentary evidence introduced at trial indicates that this offer
was made before A.L.'s enrollment at Outback, and there is no evidence that Loras renewed this
offer when A.L.'s post-Outback placement was being considered, suggested any other placements
for A.L., or made any effort to investigate the possibility of A.L.'s enrollment elsewhere.

 After receiving no response from Loras, Mitchell informed Loras that A.L. had been
accepted into Discovery Ranch and would be enrolled there upon his discharge from Outback. 
Despite Loras's characterization of Discovery Ranch as a "boarding school," the evidence
established that Discovery Ranch was a licensed residential treatment facility that provided regular
counseling to A.L. (individual, group, and family counseling) and a comprehensive therapeutic
environment. Loras regularly participated in A.L.'s therapy sessions, and he neither attempted to
withdraw him from the program nor asked that he be withdrawn. Indeed, it is undisputed that Loras
encouraged A.L. to remain enrolled at Discovery Ranch when A.L. suggested withdrawing from the
program. Loras testified that he availed himself of the psychological services offered at Discovery
Ranch and was amenable to A.L.'s treatment there but did not want to pay for it because he believed
the costs to be beyond his financial means.

 Following his discharge from Discovery Ranch, A.L. was successfully enrolled in
college and now lives with his father when he is not in school. Mitchell testified that she believes
her son would likely have ended up in jail had he not received treatment at Outback and Discovery
Ranch. Mitchell's husband testified that A.L. would likely have ended up in jail or a state home for
psychiatric care. Loras testified that he had harbored doubts about whether A.L. could become a
productive adult if he was unable to control his anger.

 There is sufficient evidence in the record that Outback and Discovery Ranch are
intensive, inpatient therapeutic programs that provided mental health-care services to A.L., including
regular counseling and therapy sessions and an environment fully integrating therapeutic goals for
A.L. Moreover, there is no evidence that the expenses were incurred for any purpose other than to
address A.L.'s mental-health issues. Therefore, we conclude that the trial court did not abuse its
discretion in determining that the expenses for these services qualify as health-care expenses,
regardless of whether there are distinct elements of care that, standing in isolation, might not
otherwise independently qualify as mental health-care services. Cf. Rambo, 2002 WL 24033, at *2
(rejecting father's argument that evidence was insufficient to establish that residential treatment
center provided psychological, physical or health-care services rather than private school). We
overrule Loras's first and fifth issues.


Requirement of Consent to Treatment or Emergency Circumstances

 In his second and third issues, Loras contends that, even if the expenses incurred at
Outback and Discovery Ranch qualify as reimbursable health-care expenses, he is not responsible
for his proportionate share of the expenses because the divorce decree requires the parents' joint
consent to any medical treatment and the Agreed Order requires the use of providers covered by
insurance, except in emergency circumstances or by agreement of the parties. It is undisputed that
Mitchell failed to use insurance-approved providers, and Loras contends that he did not consent to
A.L.'s treatment and that the evidence is insufficient to establish that an "emergency" existed. 
Because we conclude that the evidence is sufficient to support a finding that Loras effectively
consented to A.L.'s treatment at Outback and Discovery Ranch, we do not reach the issue of whether
the circumstances present an "emergency" within the meaning of the Agreed Order.

 Loras contends that his consent to treatment is required based on (1) two related
provisions in the Agreed Order--paragraph 5 and subparagraph 8(b)--and (2) the provisions in the
divorce decree appointing both parents as joint managing conservators with the right to consent to
A.L.'s medical treatment and to consent on A.L.'s behalf to medical treatment involving psychiatric
and psychological treatment. (2)
 Paragraph 5 of the Agreed Order provides:


 5. Compliance with Insurance Company Requirements-- . . . Each party shall
attempt to use 'preferred providers,' or services within the health maintenance
organization, if applicable; however this provision shall not apply if emergency care
is required or agreement between the parties.


(Emphases added.) The trial court determined that the use of the word "attempt" in this paragraph
made the use of "preferred providers" or providers employed by a health maintenance organization
discretionary. We hold that the trial court's interpretation of this provision is not unreasonable.

 Even if the requirement were not discretionary, however, the trial court did not abuse
its discretion in concluding that the exception based on the parties' agreement was satisfied because
Loras implicitly or explicitly consented to A.L.'s treatment at Outback and Discovery Ranch. There
is sufficient evidence in the record that Loras (1) was informed that A.L. needed immediate
intervention, (2) agreed with A.L.'s removal from his home and did not suggest an immediate
alternative placement, (3) was promptly advised about A.L.'s placement at Outback and was
provided information about the program, (4) was advised of A.L.'s prospective enrollment at
Discovery Ranch and actual enrollment, (5) did not withdraw or seek to withdraw A.L. from either
program or ask that he be withdrawn from either program, and (6) participated in both programs with
A.L. and repeatedly encouraged A.L. not to withdraw from Discovery Ranch. Whether characterized
as consent, ratification, or estoppel from denying lack of consent, the trial court did not abuse its
discretion in concluding that Loras consented to A.L.'s treatment at Outback and Discovery Ranch
to the extent consent is required under paragraph 5 of the Agreed Order or the final divorce decree.

 Loras also contends that we must construe subparagraph 8(b) of the Agreed Order to
require an emergency or written agreement before he is obligated to pay 50% of A.L.'s health-care
expenses. He asserts that any other construction would render subparagraph 8(b)'s provisions
meaningless when that subparagraph is construed together with subparagraph 8(a). In essence, Loras
contends that because both subparagraphs (a) and (b) require a 50/50 apportionment of expenses,
those paragraphs would lack distinctive meaning unless subparagraph (b) is read to require an
emergency or a written agreement as a condition to his obligation to contribute. We disagree. Aside
from the fact that subparagraph 8(b) explicitly applies without regard to an emergency or agreement
of the parties, the paragraphs apply to different situations and thus have meaning without adding the
limitations Loras suggests.

 Paragraph 8 of the Agreed Order provides, in relevant part, as follows:

 8. Health-Care Expenses Not Paid by Insurance--Subject to the provisions in
paragraph 5, immediately above, IT IS ORDERED that, if health-care
expenses are incurred for the child, [Loras] and [Mitchell] shall pay all
reasonable and necessary health-care expenses not paid by insurance and
incurred by or on behalf of the child in the following portions:

 

 a. If the health-care expenses are incurred by using a HMO or
PPO plan, in an emergency, or with the written agreement of
the other party, [Loras] is ORDERED to pay fifty
(50%) percent and [Mitchell] is ORDERED to pay
fifty (50%) percent.

 

 b. Except in an emergency or if the other parent agreed in
writing, if a party incurs health-care expenses for the child by
using the services of health-care providers not employed by
the HMO or approved by the PPO, [Loras] is ORDERED to
pay fifty (50%) percent and [Mitchell] is ORDERED to pay
fifty (50%) percent.

 

 c. If [Loras] provides health insurance for the child through an
HMO or a PPO that does not provide coverage for the child
where the child resides or have network providers in the area
where the child resides,[Loras] is ORDERED to pay fifty
(50%) percent and [Mitchell] is ORDERED to pay fifty
(50%) percent.


 d. If the child is enrolled in a health-care plan that is not an
HMO or a PPO, [Loras] is ORDERED to pay fifty (50%)
percent and [Mitchell] is ORDERED to pay fifty
(50%) percent.


 e. If the child was enrolled in a medical assistance program
[under state law] and is no longer eligible for coverage in that
plan or program, [Loras] is ORDERED to pay fifty (50%)
percent and [Mitchell] is ORDERED to pay fifty (50%)
percent until health insurance is provided for the child or the
child is again eligible for enrollment [in the applicable state
health-care plans].


Subparagraph (a) requires a 50/50 split if non-covered health-care expenses are incurred using
covered providers, in an emergency, or with the parties' written agreement. Subparagraph (b)
requires a 50/50 split if non-covered health-care expenses are incurred because the parties used a
provider not covered by the plan. We do not perceive an ambiguity or irreconcilable conflict in these
provisions merely because they would effectively require a 50/50 split of health-care expenses in
most, if not all, cases and because there might be some overlap in their application. The clear intent
of paragraph 8 is to provide equal apportionment of health-care expenses not covered by insurance
in most, if not all, scenarios. This is evidenced not only by the breadth of subparagraphs (a) and (b)
but also by the inclusion of subparagraphs (c), (d), and (e), which similarly provide for an equal
apportionment of non-covered expenses. An unambiguous contract is construed according to the
plain meaning of its express wording. See, e.g., Feiss v. State Farm Lloyds, 202 S.W.3d 744, 753
(Tex. 2006) ("[W]here the language is plain and unambiguous, courts must enforce the contract as
made by the parties, and cannot make a new contract for them, nor change that which they have
made under the guise of construction."). The Agreed Order does not require written consent as a
prerequisite to apportionment of expenses under subparagraph 8(b). Indeed, the existence of a
written agreement between the parties is an exception to the application of subparagraph 8(b). And
to the extent consent is required under paragraph 5, to which the apportionment provisions are
subject, we have already concluded that the trial court did not abuse its discretion in determining that
Loras consented to A.L.'s treatment at Outback and Discovery Ranch. Loras's second and third
issues are therefore overruled.


Offset for Non-Health-Care Child-Support Payments

 In his fourth issue, Loras contends that the trial court abused its discretion by failing
to offset the amounts Loras paid to Mitchell for child support while A.L. was being treated at
Outback and Discovery Ranch. Loras did not plead offset, however. "The right of offset is an
affirmative defense. The burden of pleading offset and of proving facts necessary to support it are
on the party making the assertion." Brown v. American Transfer & Storage Co., 601 S.W.2d 931,
936 (Tex. 1980); see also Tex. Fam. Code Ann. § 157.008(d) (West 2008) ("An obligor who has
provided actual support to the child during a time subject to an affirmative defense under this section
may request reimbursement for that support as a counterclaim or offset against the claim of the
obligee."); Tex. R. Civ. P. 94 ("[A] party shall set forth affirmatively . . . any . . . matter constituting
an avoidance or affirmative defense."). Loras failed to plead offset as a defense in the underlying
action; therefore, the point is waived. We overrule Loras's fourth issue.


CONCLUSION

 We hold that the trial court did not abuse its discretion in determining that (1) the
expenses incurred on A.L.'s behalf at Outback and Discovery Ranch are fully reimbursable
health-care expenses, (2) use of covered providers is discretionary under the terms of the Agreed
Order, (3) Loras tacitly or explicitly consented to A.L.'s treatment at Outback and Discovery Ranch,
and (4) Loras waived his claim for an offset. For these reasons, the trial court's judgment is
affirmed.


 _________________________________________

 J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose


Affirmed

Filed: July 12, 2012

1. Paragraph 8 of the Agreed Order specified three additional scenarios in which health-care
expenses not covered by insurance must be apportioned between the parties, none of which is alleged
to be applicable in this case and all of which similarly require a 50/50 split between Loras
and Mitchell.
2. Loras's and Mitchell's rights and duties as joint managing conservators are set out in the
divorce decree as follows:


 IT IS ORDERED that the parents, as Joint Managing Conservators, shall each retain
the right at all times to receive information from the other concerning the health,
education, and welfare of the child and to the extent possible to confer with the other
party prior to a decision being made concerning the health, education and welfare of
the child.

 

 IT IS FURTHER ORDERED that each party shall have the duty to inform the other
parent in a timely manner of significant information concerning the health, education
and welfare of the child.

 

 Each party is ORDERED and DECREED to inform the other party as soon as
possible, but in no instance no more than 4 hours of any medical condition of the
parties' child requiring surgical intervention and/or hospitalization.

 

 . . . .

 

 Rights of the Parents at all times. IT IS ORDERED and DECREED that at all times
the parents, as Joint Managing Conservators, shall each retain the following rights:

 

 . . . .

 

 6. to consent to medical . . . treatment during an emergency involving an immediate
danger to the health and safety of the child;

 

 7. to consent for the child to medical . . . treatment involving invasive procedures
and for psychiatric and psychological treatment;

 

 8. to consent for the child to medical . . . care not involving an invasive procedure;
. . .