# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00645-CV

---

### K. M., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. C200034CPS, THE HONORABLE GARY L. BANKS, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

K.M. (Mother)[1] appeals the trial court's Final Order in Suit Affecting the Parent–Child Relationship, entered after a bench trial. The Department of Family and Protective Services filed the suit, seeking protection of two of Mother's children, A.C.A.G. (Son) and A.M.G. (Daughter), or to terminate her parental rights to them. While it did not terminate Mother's parental rights, the court in the Final Order denied Mother any conservatorship designation for the children and ordered that "she shall have no rights of possession or access to" them, among other rulings. In two appellate issues, Mother contends that (1) the "trial court abused its discretion in providing no designation and no access for" her and (2) "[i]t was not in the best interest of the children to have no visitation or access to their mother." We affirm in part and reverse and remand in part.

---

[1] We refer to Mother, the children, and other individuals by their initials or by generic relational terms like "Mother." *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

BACKGROUND

Son was nine years old and Daughter eight at the time of trial in October 2021. Mother's now-former friend A.F. knew the children from their birth and would often watch the children when Mother was away. Before the Department's case began in February 2020, Son and Daughter lived with Mother; Mother's boyfriend, who was not their father; and Mother and her boyfriend's older son. Mother and the boyfriend later had a second son together.

One day not long before this suit, Mother was away at work, and the boyfriend was at home with Son. The boyfriend allegedly abused Son, leaving bruises on his thighs and buttocks. The abuse allegation caused the Department to remove Son and Daughter from Mother's care, which led Mother to choose to place her younger two sons with the boyfriend's mother. Son and Daughter have been living with A.F. since their removal.

Mother owns a home that is being renovated and lives elsewhere by herself. The Department's caseworker tried to visit Mother's current home with little success. The one time that he met with her there, he saw that the home had almost no furniture outside the master bedroom, had no food in the refrigerator, and looked unoccupied. After leaving, he drove elsewhere for about 10 minutes before going back by Mother's home. When he drove back there, he saw that the boyfriend's Jeep was parked there, when it had not been during the visit.

Mother had some visitations and phone calls with Son and Daughter during this suit, but the Department ended all visitations in March 2021. She went through some Department-approved counseling sessions and parenting classes, but the Department demanded that she take a specific type of counseling before she could see the children again. The caseworker and his supervisor told Mother to "complete counseling focused on . . . preparing for family counseling with the children, and that, also, the children would need to be recommended by their

counselor to restart family therapy." But Mother did not complete that kind of counseling, instead seeking out on her own and receiving a different kind of counseling.

Meanwhile, Son and Daughter were benefitting from living with A.F. She put them in sports activities and did many day-to-day tasks with them. Son fears ever being around the boyfriend again, and he does not believe Mother when she says that she will ensure that the boyfriend will not be around.

During the October 2021 trial, Mother, the caseworker, and A.F. testified.[2] No exhibits were admitted, and the court took judicial notice of its file only to the extent that it reflected Mother's motion for a continuance. After trial, the court entered the Final Order and findings of fact and conclusions of law. The court appointed A.F. as the children's managing conservator, denied Mother appointment as either managing conservator or possessory conservator, and ordered that she have no possession of or access to the children at all.

## APPLICABLE LAW AND STANDARD OF REVIEW

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code § 153.002; *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021). "As conservatorship determinations are 'intensely fact driven,' the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record.'" *J.J.R.S.*, 627 S.W.3d at 218 (first quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002), then quoting *Echols v. Olivarez*, 85 S.W.3d 475, 477

_____

[2] Son and Daughter's father briefly testified as well. He and the Department reached an agreement about his rights to Son and Daughter.

(Tex. App.—Austin 2002, no pet.)). "A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function." *Id.* "The trial court's judgment will be reversed only when it appears from the record as a whole that the court has abused its discretion." *Id.* We are to "give wide latitude to a trial court's decision on custody, control, possession, and visitation matters." *J.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00670-CV, 2013 WL 1405892, at *8 (Tex. App.—Austin Apr. 3, 2013, no pet.) (mem. op.).

"A trial court abuses its discretion when it acts 'without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably.'" *J.J.R.S.*, 627 S.W.3d at 218 (alteration in original) (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)). There is no abuse of discretion so long as some evidence of a substantive and probative character supported the trial court's decision. *Iliff v. Iliff*, 339 S.W.3d 126, 134 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). When, as here, the appellant challenges the legal and factual sufficiency of the evidence to support the trial court's findings and review is for an abuse of discretion, legal and factual sufficiency are not independent grounds of error but are instead relevant factors to consider when deciding whether the trial court abused its discretion. *Philipp v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00418-CV, 2012 WL 1149291, at *7 (Tex. App.—Austin Apr. 4, 2012, no pet.) (mem. op.); *Stritzinger v. Wright*, No. 03-10-00455-CV, 2011 WL 677402, at *4–5 (Tex. App.—Austin Feb. 23, 2011, pet. denied) (mem. op.). In deciding whether the trial court abused its discretion because the evidence was legally or factually insufficient to support its findings, "we engage in a two-pronged inquiry: (1) Did the trial court have sufficient information on which to exercise its discretion; and (2) did the trial court err in its

4

application of discretion?" *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied)), *quoted in Philipp*, 2012 WL 1149291, at *7.

On top of the best-interest finding, the trial court's other findings on conservatorship also are reviewed for an abuse of discretion. *See Philipp*, 2012 WL 1149291 at *7, 9; *Fish v. Lebrie*, No. 03-09-00387-CV, 2010 WL 5019411, at *10–11 (Tex. App.—Austin Dec. 10, 2010, no pet.) (mem. op.). A parent shall be appointed his or her child's sole managing conservator, or both parents their child's joint managing conservators, unless a court finds that the appointment would not be in the child's best interest "because the appointment would significantly impair the child's physical health or emotional development." *See* Tex. Fam. Code § 153.131(a); *J.J.R.S.*, 627 S.W.3d at 218; *see also Fish*, 2010 WL 5019411, at *8 (stating that request "to deny [a] parent all access to or possession of their child" necessarily involves "the 'onerous burden to show that access by [the parent] would endanger [the child's] physical health or significantly impair [his] emotional development'" (first and second alterations added, third and fourth in original) (quoting *Allison v. Allison*, 660 S.W.2d 134, 137–38 (Tex. App.—San Antonio 1983, no writ))). This standard is more generalized than that under the statutes for terminating parental rights: "Unlike for terminations, the family code does not enumerate specific behaviors to be considered when making conservatorship determinations and instead employs a more general standard." *In re E.N.C.*, No. 03-07-00099-CV, 2009 WL 638188, at *9 (Tex. App.—Austin Mar. 13, 2009, no pet.) (mem. op.) (citing *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007)).

"A parent who is not appointed managing conservator 'shall' be appointed possessory conservator, 'unless [the court] finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child.'" *J.J.R.S.*, 627 S.W.3d at 218 (alteration in original) (quoting Tex. Fam.

5

Code § 153.191). "A court, based on these parameters, must then determine the conservators' appropriate level of possession and access." *Id.* "There is a rebuttable presumption that the standard possession order provides the reasonable minimum level of possession and access for a parent named possessory conservator and is in the best interest of the child." *Id.* (citing Tex. Fam. Code § 153.252). "When determining whether to deviate from the standard possession order, a court may consider '(1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor.'" *Id.* (quoting Tex. Fam. Code § 153.256). "[T]he terms of . . . an order that 'denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child' . . . 'may not exceed those that are required to protect the best interest of the child.'" *Id.* at 218–19 (quoting Tex. Fam. Code § 153.193). "[A] court must 'specify and expressly state in the order the times and conditions for possession of or access to the child, unless a party shows good cause why specific orders would not be in the best interest of the child.'" *Id.* at 219 (emphasis removed) (quoting Tex. Fam. Code § 153.006(c)). "On request by a party, the court shall state in writing the specific reasons for the variance from the standard possession order." *Id.* at 219 n.4 (citing Tex. Fam. Code § 153.258(a)).

"Complete denial of parental access amounts to a near-termination of a parent's rights to his child and should be reserved for situations rising nearly to the level that would call for a termination of parental rights." *Philipp*, 2012 WL 1149291, at *8; *Fish*, 2010 WL 5019411, at *3. "Thus, a 'complete denial of access should be rare,' and reserved only for 'the most extreme of circumstances.'" *Philipp*, 2012 WL 1149291, at *8 (internal citation omitted) (first quoting *In re Walters*, 39 S.W.3d 280, 287 (Tex. App.—Texarkana 2001, no pet.), then quoting *E.N.C.*,

6

2009 WL 638188, at \*15); *Fish*, 2010 WL 5019411, at \*3 (same). "In such cases, we must find a balance between deferring to the trial court's factual determinations and carefully examining the record for evidence of extreme circumstances, holding the evidence to a higher standard than we would an order that merely limited a parent's access." *Philipp*, 2012 WL 1149291, at \*8 (citing *E.N.C.*, 2009 WL 638188, at \*18; *Allison*, 660 S.W.2d at 137); *Fish*, 2010 WL 5019411, at \*3 (same). The evidence must "demonstrate the presence of extreme circumstances . . . to justify a denial of all access and possession." *E.N.C.*, 2009 WL 638188, at \*16.

The findings necessary to support the trial court's conservatorship decisions against the parent need be supported by only a preponderance of the evidence, rather than clear and convincing evidence. *See* Tex. Fam. Code § 105.005; *J.A.J.*, 243 S.W.3d at 616. This is true even in the context of an order that completely denies the parent access to the child. *See E.N.C.*, 2009 WL 638188, at \*9 (applying Section 105.005's preponderance standard in appeal involving complete denial of access). Under this standard, "evidence is legally sufficient when it would 'enable reasonable and fair-minded people to reach the verdict under review'" and is "factually insufficient 'only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.'" *Id.* (first quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005), then quoting *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)).

When, as here, trial was to the bench, we defer to the trial court's decisions on the credibility of the witnesses and the weight to be given their testimony and on its resolution of conflicts in the evidence. *See Fish*, 2010 WL 5019411, at \*2; *Rodriguez v. Texas Dep't of Fam. & Protective Servs.*, No. 03-07-00467-CV, 2008 WL 1990006, at \*9 (Tex. App.—Austin May 8, 2008, no pet.) (mem. op.). Review of the best-interest determination involves the *Holley* factors. *See Davidson v. Davidson*, No. 03-19-00924-CV, 2021 WL 279247, at \*3 (Tex. App.—Austin

Jan. 28, 2021, no pet.) (mem. op.); *Philipp*, 2012 WL 1149291, at *8. Those factors are (1) the child's desires, (2) the child's present and future emotional and physical needs, (3) emotional and physical danger posed to the child now and in the future, (4) the parenting abilities of the individuals seeking custody, (5) programs available to assist the would-be parents, (6) the individuals' or agency's plans for the child, (7) the stability of the proposed homes, (8) any acts or omissions by the parent that might show an improper parent–child relationship, and (9) any excuse for such acts or omissions. *Davidson*, 2021 WL 279247, at *3 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *Philipp*, 2012 WL 1149291, at *8 (same).

## DISCUSSION

Mother's two appellate issues attack rulings on which the Final Order's decisions on conservatorship, possession, and access rest. The trial court did not designate Mother as either managing or possessory conservator for Son or Daughter and ruled that Mother "shall have no rights of possession or access to the Children." In support of this, the court entered findings of fact and conclusions of law, which say that appointing Mother as the children's managing conservator "would not be in the[ir] best interest . . . because such appointment would significantly impair [their] physical health and emotional development." When explaining why it did not appoint Mother as possessory conservator either, the court said in its findings and conclusions that her having "possession and access to the Children . . . would endanger the physical or emotional welfare of the Children." It added that applying "the standard possession order" in Mother's favor "to the facts and circumstances of this case is unworkable and inappropriate" and that denying "rights of possession and access to the Children by . . . Mother do[es] not exceed [what is] necessary to protect the best interests of the Children and there is good cause for the Court . . . not

8

to order specific periods of possession and access to the Children by . . . Mother." The court in its findings and conclusions described its overall decision as "in the best interest of the Children."

We begin with best interest because the children's best interest is the primary consideration when deciding possession and access. *See* Tex. Fam. Code § 153.002; *J.J.R.S.*, 627 S.W.3d at 218. In her second issue, Mother contends that "[i]t was not in the best interest of the children to have no visitation or access to their mother."

Under the first *Holley* factor—the children's desires—there was evidence to support the trial court's rulings. The caseworker testified that Son and Daughter have told him what they want to happen and that they are happy living with A.F. More specifically, Son has expressed concern to the caseworker that Mother is lying about whether the boyfriend will still "be around," and Son disbelieves Mother when she says that she will keep the boyfriend away. A.F. then testified about Son and Daughter's negative reactions to interacting with Mother. Son has said that he is "uncomfortable" with seeing her—so much so that he and A.F. would sometimes hang back away from Mother when she would arrive to pick up Daughter. And even before Son and Daughter were removed from Mother's care, Son "would scream and cry that he did not want to be left" alone with the boyfriend when A.F. would drop the children off at Mother's home. Son, according to the caseworker, "is very fearful of any contact with" the boyfriend.

Mother disputed much of this, accusing A.F. of causing the tension. She testified that A.F. has bribed the children and sabotaged their relationship with her. For example, A.F., Mother testified, would take Son to one of his favorite places so he would not want to go on a visit with Mother scheduled for the same time. Mother also said that A.F. has refused to agree to visits for Mother outside Department offices; has kept Mother from taking Son along when she had the

9

chance to take Daughter for a visit; and has signed the children up for sports whose schedules interfered with Mother's scheduled visits, including games that Mother was barred from attending.

The witnesses' competing testimony gave the trial court the chance to choose whom it believed. *See Fish*, 2010 WL 5019411, at *2; *Rodriguez*, 2008 WL 1990006, at *9. It enjoyed the discretion to believe the caseworker and A.F. and to disbelieve Mother, with the result that the first *Holley* factor supports the court's decision.

Under all the rest of the *Holley* factors, there was more evidence to support the court's rulings. Central to the trial was the allegation of abuse that led to Son and Daughter's removal. Mother admitted that the Department got involved in or about February 2020, when it was alleged that the boyfriend abused then-eight-year-old Son. She admitted that Son came away from the event with "bruises on his buttocks and thighs." The boyfriend's behavior fueled Son's fears, explained above, making boyfriend's continued involvement, or not, in Mother's life crucial to her ability to protect the children in the future. In this vein, she testified that the boyfriend no longer lives with her, they have only intermittent contact, she last spoke with him about a month before trial when he gave her a ride, and she spent the previous Christmas holiday with him and his family because his mother has custody of the sons that he and Mother had together. Mother's plans for Son and Daughter involved keeping them away from the boyfriend: she said she will make sure that "he doesn't come around or take them around him, ever."

And yet, other evidence undermined her assurances. After his visit to Mother's home, about two months before trial, the caseworker left but then drove back by soon after and saw the boyfriend's Jeep parked there, when it had not been there during the visit shortly before. The caseworker testified that Mother is maintaining her relationship with the boyfriend and endangering the children by doing so.

10

Throughout most of the suit, Mother denied that the boyfriend had ever hurt Son. But at trial, she testified that she changed her mind after she "attended counseling on [her] own" and a parenting class, both of which helped her "conclu[de] that whatever [her] children state, [she] should listen to what they . . . say." If the boyfriend stayed a part of Mother's life, the caseworker believed, Mother's home would not be "free from violence." A.F. echoed this, testifying that it was not a good idea for the children to be with Mother unsupervised or in any situation in which they might be around the boyfriend. The evidence that the boyfriend stayed in Mother's life, including visiting her home, despite her assurances to the contrary support the view that the trial court's rulings served Son's and Daughter's best interests under several *Holley* factors. *See* 544 S.W.2d at 371–72 (child's present and future emotional and physical needs, emotional and physical danger posed to child now and in the future, parenting abilities of the individuals seeking custody, the individuals' or agency's plans for the child, stability of the proposed homes, and any acts or omissions by the parent that might show an improper parent–child relationship).

Other evidence also cast Mother as unprepared to care for Son and Daughter. Largely because of the abuse, all three of Mother, the caseworker, and A.F. agreed that the children should receive counseling, continuing after trial. Mother expressed interest in attending family counseling with them. But about seven months before trial, the Department ended all visitations for Mother and told her the steps it wanted her to take to see visitations restarted. Both the caseworker and his supervisor told Mother that she needed to "complete counseling focused on . . . preparing for family counseling with the children, and that, also, the children would need to be recommended by their counselor to restart family therapy." The caseworker specifically told her that the counseling needed to be "focused on injuries to children, reconnecting with the children, [and] preparing for family counseling with" them. But Mother did not complete that

11

counseling—she missed sessions and so was discharged by the assigned counselor. The counseling that Mother did seek out and receive, which she reported to the caseworker, did not meet the Department's requirements because the sessions involved only topics like "personal care counseling subjects" like "self-health" and "relaxation techniques." Because the planned family counseling for Mother, Son, and Daughter together fell through, it was, according to the caseworker, another source of trauma for the children and caused regression and delays in their therapy. On the infrequent occasions when she did talk on the phone with Son and Daughter, according to A.F., Mother was not very engaged. The caseworker saw Mother's home, and it lacked furniture outside the master bedroom and looked unoccupied. She had also turned over care of her younger sons to her boyfriend's mother. Mother's not achieving through counseling what the Department thought she needed for reuniting with the children, her disengagement, and the unpreparedness of her home for children all support the view that the trial court's rulings served Son's and Daughter's best interests, under several *Holley* factors. *See id.* (child's present and future emotional and physical needs, parenting abilities of individuals seeking custody, the individuals' or agency's plans for child, stability of the proposed homes, and any acts or omissions by the parent that might show an improper parent–child relationship).

Contrast all this with the evidence of the children's lives with A.F., who has known them since they were born. They have lived with her since this case started, and she wants to be their long-term placement. She keeps them involved in sports activities, spends most of every day with them, cooks dinner with them, takes them to the park, and helps them do homework. Her care of them won the caseworker's praise. He considers her home to be safe, stable, and appropriate for them. He said they "have a very good bond" with her and are "tightly bonded" with each other as well. And contrasting with his view of Mother, the caseworker believed that

12

A.F. has "demonstrated her ability to protect these children" and to "take care of them now and in the future." He based his views on Mother's inability "to show any protectiveness of the children throughout the case," her missed counseling appointments, the children's success in therapy, and that therapist's recommendation that they have no contact with Mother "at this time."

To counteract the Department's evidence, Mother testified and elicited from the caseworker an admission that Mother herself had never been reported for ever abusing the children. She testified about her home situation, impediments owing to the caseworker, and the course of events surrounding the counseling issues. After he visited her home, Mother testified, the caseworker did not tell Mother that her home needed any changes to be suitable for the children. She added that he has given her incorrect information, including telling her that a court hearing had been canceled. (She also explained that she was asleep the day of that hearing and was suffering from COVID-19.) She testified that she went to counseling requested by the Department before her visitations were stopped. And after the Department stopped visitations and asked that she receive the specific kind of counseling outlined above, she could not find such a counselor in her area because of the open case involving the children. She had missed sessions with a Department-approved counselor because of her confusion over whether the counselor offered the sessions over Zoom. Mother took parenting classes and found and took counseling on her own, and those sessions addressed how to prevent abuse and neglect of children. She is willing to take more classes. Finally, she told the court that she can provide for the children because she has a job, owns her own home, and can give them a safe environment.

But overall, the court could simply have disbelieved Mother and believed the caseworker and A.F. instead. *See Fish*, 2010 WL 5019411, at *2; *Rodriguez*, 2008 WL 1990006, at *9. The latter two's testimony, when viewed through the prism of the *Holley* factors, would

13

enable reasonable and fair-minded people to conclude that the court's decisions on possession and access were in Son's and Daughter's best interests, making the evidence legally sufficient to support the best-interest finding. *See E.N.C.*, 2009 WL 638188, at *9 (quoting *City of Keller*, 168 S.W.3d at 827). And because the court could have disbelieved Mother, the evidence left—the caseworker's and A.F.'s testimony—was not overwhelmingly weighted against the court's best-interest finding, making the evidence overall factually sufficient to support the finding. *See id.* (quoting *Cain*, 709 S.W.2d at 176). The trial court thus had sufficient evidence on which to exercise its discretion in making its best-interest finding and did not err in its application of that discretion. *See Philipp*, 2012 WL 1149291, at *7. Mother's best-interest challenge thus fails, so we overrule her second issue.

Mother's first issue challenges several of the other rulings on which the Final Order's decisions on conservatorship, possession, and access rest. She contends by this issue that the "trial court abused its discretion in providing no designation and no access for" her.

To deny Mother managing conservatorship of the children, the trial court needed to find that appointing her managing conservator would significantly impair the children's physical health or emotional development. *See* Tex. Fam. Code § 153.131(a); *J.J.R.S.*, 627 S.W.3d at 218. The trial court made that finding, and we conclude that the finding was supported by the evidence. *In re K.S.*, 492 S.W.3d 419, 428 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). The evidence established that the boyfriend had abused Son, Son was afraid of ever being around the boyfriend again, Mother long denied the abuse but only lately changed her mind about that, she denied keeping the boyfriend around while other evidence showed that claim to be false, and the children's therapist recommended neither child have contact with Mother. Plus, Mother's home was not prepared for children, she was disengaged from them when she did have chances to talk

14

to them, the children were benefitting from A.F.'s care, and Mother relinquished the day-to-day care of her younger sons to the sons' paternal grandmother. That last circumstance goes a long way toward ensuring that Mother will continue to have contact with the boyfriend, such as when they spent the immediately previous Christmas holiday together. All these circumstances together support the necessary finding under Section 153.131(a). *See C.O. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00453-CV, 2022 WL 413374, at *4 (Tex. App.—Austin Feb. 11, 2022, no pet.) (mem. op.) (relevant matters include physical abuse, "immoral behavior," "parental irresponsibility," and "bad judgment"); *In re A.M.T.*, 592 S.W.3d 974, 978–79 (Tex. App.—San Antonio 2019, pet. denied) (evidence supported necessary finding in part because of parents' mutual domestic violence, inconsistent visits with child, and unstable housing and child's thriving in alternative placement); *K.S.*, 492 S.W.3d at 428 (evidence supported necessary finding against mother in part because she "mostly just watched her husband physically abuse the children," failing to stop it, and psychologist recommended placing children outside mother's or husband's care). This includes the necessary finding about managing conservatorship of Daughter as well— we have in the past considered the circumstances of a parent's paramour's potential for violence and suspected abuse against one child as support for denying the parent managing conservatorship of a different child. *See, e.g.*, *E.N.C.*, 2009 WL 638188, at *10–14 (listing as support for denying parent managing conservatorship of child E.N.C. history of parent's involvement with abusive paramours from before E.N.C. was born and suspected abuse by at least one paramour against different child, C.C.). The trial court thus did not abuse its discretion by denying appointing Mother as the children's managing conservator.

To deny her possessory conservatorship, the court needed to find that, in addition to "best interest," which we have already covered, appointing Mother would endanger the

15

children's physical or emotional welfare. *See* Tex. Fam. Code § 153.191; *J.J.R.S.*, 627 S.W.3d at 218. The trial court made that finding, and we conclude that the finding was supported by the evidence, specifically, the evidence discussed above under both the best-interest and managing-conservatorship topics. *See Chad S. v. Melinda S.*, No. 02-14-00135-CV, 2015 WL 7820584, at *9–10 (Tex. App.—Fort Worth Dec. 3, 2015, no pet.) (mem. op.) (evidence supporting necessary finding included parent's not recognizing his potential danger to child and not following recommendation for counseling); *J.C.*, 2013 WL 1405892, at *6–8 (evidence supporting necessary finding included that parent "was unable to take care of the children or provide the children with a safe environment" and "that the children were doing well in their current placement and that their needs were being met" and factfinder could have disbelieved parent's contrary testimony); *Walters*, 39 S.W.3d at 287 (evidence supporting necessary finding included "significant evidence that [mother] had placed [child] in danger in the past," for example, violent, drunken rages and "on more than one occasion . . . dr[inking] to the point of passing out while [child] was in her care"); *see also Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) ("While we agree that 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. Rather, 'endanger' means to expose to loss or injury; to jeopardize." (internal citation omitted)); *Chad S.*, 2015 WL 7820584, at *9 ("'Endanger' is defined as 'imperil or threaten danger to.'" (quoting Webster's Third New International Dictionary 748 (2002))). The trial court thus did not abuse its discretion by refusing to appoint Mother as possessory conservator of the children.

We note that the Family Code contemplates circumstances like these—when a parent is denied both managing and possessory conservatorship of the parent's child but still has

16

some continued duties involving the child. For example, a "court may order a parent not appointed as a managing or a possessory conservator to perform other parental duties, including paying child support." Tex. Fam. Code § 153.075. Plus, courts may restrict parents' possession of their children: "The terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193.

But the Final Order went further by *completely* denying possession and access. Courts "should only decide to deny a parent all access and possession in the most extreme of circumstances." *E.N.C.*, 2009 WL 638188, at *15. "Complete denial of parental access amounts to a near-termination of a parent's rights to his child and should be reserved for situations rising nearly to the level that would call for a termination of parental rights." *Philipp*, 2012 WL 1149291, at *8. "Because the right that exists between a parent and his child is one of 'constitutional dimensions' and due to the extreme nature of a determination cutting off all access and possession, courts review complete denials of access under a heightened standard." *E.N.C.*, 2009 WL 638188, at *15 (quoting *Allison*, 660 S.W.2d at 137).

"Cases involving complete denial of access are rare and usually reversed." *Fish*, 2010 WL 5019411, at *9; *accord In re Marriage of Patel & Parrish*, __ S.W.3d __, 2022 WL 709872, at *6 (Tex. App.—Texarkana Mar. 10, 2022, no pet.). "In virtually every other case in which a trial court ordered a complete denial of access, the appellate court has reversed the trial court, remanding for the trial court's reconsideration and determination of the appropriate amount and type of access and any necessary conditions." *Fish*, 2010 WL 5019411, at *9. The evidence must show "extreme circumstances," alongside the other required findings that we have already

addressed, to support completely denying possession and access. *See Philipp*, 2012 WL 1149291, at *8; *Fish*, 2010 WL 5019411, at *3; *E.N.C.*, 2009 WL 638188, at *16.

Our only precedent affirming an order that completely denied possession and access appears to be *Philipp*. The actions by the parent in that case were extreme in a way that Mother's acts and omissions are not. *Philipp* involved a mother and her adopted, elementary-school-aged daughter. *See* 2012 WL 1149291, at *1–2. The mother hit the daughter in the jaw, causing her to swallow a tooth; taped her eyes, nose, and mouth shut to quiet her and hurt her when removing the tape; pushed her into a wall, causing a bump on her head; forced her to sleep without a shirt and with only pants and a sheet and then took away a shirt and blanket that the father had given the daughter after she said she was cold; and put her in an empty bathtub and poured ice cubes over her head. *Id.* at *9. Mother is not like the *Philipp* mother.

Her acts and omissions are more like, but less severe than, those of the father in *Fish*. There, we reversed an order that completely denied that father possession of or access to his son. *See Fish*, 2010 WL 5019411, at *1, 10–11. The son was afraid of the father; the father missed scheduled visits; he made the son watch a scary, R-rated movie after calling him "a sissy and a girl and a baby" for not wanting to; he once locked the son in a room so the father could be with his own friends; he bruised the son when spanking; he strangled the son's puppy in front of him; he spanked him for crying; he punished him by pulling his ear or pinching his arm hard enough to bruise; and the son never wanted to see his father again. *See id.* at *1, 3–8. We reversed the complete-denial order, observing that the trial court "could have crafted an order that would protect [child]'s emotional and physical well-being, perhaps through court-ordered therapy and close monitoring, while allowing [father] and [son] to slowly rebuild a relationship through limited,

18

supervised visitation, with an eye to increasing contact if and when [child] show[ed] himself ready." *Id.* at *10.

It is much the same here. We conclude that the Final Order's complete denial to Mother of possession of or access to Son and Daughter was an abuse of discretion. *See id.* (stating that order should be reversed, in part because trial court "focused exclusively on [son]'s immediate best interest, without regard to [father]'s rights or [son]'s long-term interest in dealing with his anxiety and having a relationship with his father"). We sustain Mother's first issue to this extent.[3]

**CONCLUSION**

We affirm in part and reverse in part the trial court's Final Order. We affirm the parts of the Final Order that denied appointing Mother as managing conservator or possessory conservator. But we reverse the part that completely denied her possession of and access to Son and Daughter. We remand to the trial court "to consider what amount and kind of access would be appropriate, as well as any other safeguards to help [Son and Daughter] work through [their] anxiety and to protect [their] well-being." *See id.* at *11. If the court decides to conduct a trial on these matters, then because this suit was tried as a child-protection case, the trial on remand must start within 180 days of our mandate. *See* Tex. R. App. P. 28.4(c); *M.A.R.G. v. Texas Dep't*

---

[3] We do not discern in Mother's appellate briefing any challenge to the trial court's findings that support its decision to deviate from the standard possession order.

19

*of Fam. & Protective Servs.*, No. 03-20-00413-CV, 2020 WL 7294610, at \*9 n.10 (Tex. App.—

Austin Dec. 11, 2020, no pet.) (mem. op.).

 

 

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed in Part; Reversed and Remanded in Part

Filed:   May 18, 2022